**In the Matter of Scott T. WALTON, Alison G. Walton, Debtors.**

**Herbert ERNST, Jr., Trustee, Nord Resources Corporation, Plaintiffs,**

v.

**Scott T. WALTON, Alison G. Walton, Defendants.**

**Bankruptcy No. 3–88–00747.**
**Adv. Nos. 3–88–0206, 3–88–0146 and 3–88–0207.**

United States Bankruptcy Court, S.D. Ohio, W.D.

June 30, 1989.

Alison G. Walton, Lexington, Ky., pro se.

Herbert Ernst, Dayton, Ohio, Trustee.

D. Jeffrey Ireland, Dayton, Ohio, Ronald J. Ofenkrantz, New York City, for Nord Resources.

DECISION ON ORDERS GRANTING PLAINTIFF, NORD RESOURCES CORPORATION'S AND PLAINTIFF TRUSTEE, HERBERT ERNST, JR.'S MOTIONS FOR SUMMARY JUDGMENT DENYING THE DISCHARGE OF ALISON G. WALTON AND DETERMINING DISCHARGEABILITY ISSUE TO BE MOOT

THOMAS F. WALDRON, Bankruptcy Judge.

These related adversary proceedings, which arise under 28 U.S.C. § 1334(b) in a case referred to this Court by the Standing Order of Reference entered in this district July 30, 1984, are determined to be core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I)—determinations as to the dischargeability of particular debts, and (b)(2)(J)—objections to discharge.

## I. BACKGROUND AND PRESENT PROCEDURAL POSTURE

These proceedings are before the court on the Motions For Summary Judgment, filed in *Adversary No. 3–88–0146, Nord Resources Corporation v. Walton* in which Nord Resources Corporation (Nord) seeks an order denying the dischargeability of the debt between Alison Walton and Nord (Doc. 36), *Adversary No. 3–88–0206, Herbert Ernst Jr., Trustee v. Walton* in which the Trustee seeks an order denying the discharge of Alison G. Walton (Doc. 22) and *Adversary No. 3–88–0207, Nord Resources Corporation v. Walton* in which Nord also seeks an order denying the discharge of Alison G. Walton (Doc. 30).

Debtors, Alison and Scott Walton, filed a joint petition for relief under Chapter 7 on March 9, 1988. The schedules filed by the debtor listed total indebtedness in excess of one million, four hundred thousand dollars ($1,400,000.00) and assets valued in excess of four hundred, twenty-six thousand dollars ($426,000.00) (Joint Exhibits Of Trustee And Nord Resources In Support Of Motion For Summary Judgment filed January 17, 1989, *Adversary No. 3–88–0207*, Doc. 29, hereafter Jt. Ex. 00229). The debtors listed on their A–2 Schedule—Creditors Holding Security substantial debts owed to several banks including obligations of eighteen thousand dollars ($18,000.00) and twenty-two thousand, nine hundred twelve dollars ($22,912.00) owed to Bank One, a one hundred sixty-eight thousand, six hundred thirty-six dollar ($168,636.00) debt owed Gem Savings Association and a three hundred seventy-eight thousand, six hundred twenty-two dollar ($378,622.00) obligation owed Star Bank N.A. Dayton, F.K.A. First National Bank Miamisburg. The debtors, rather than completing the information required by the Bankruptcy Rules and Official Forms, invoked their Fifth Amendment protection against self-incrimination with respect to the identity of the collateral securing these obligations (Jt. Ex. 00216, 00217). The debtors also invoked their Fifth Amendment protection during the course of the original and continued § 341(a) hearings held April 7, 1988, April 18, 1988, May 18, 1988, June 1, 1988 and June 27, 1988.

On June 28, 1988, Alison Walton entered a plea of guilty in the United States District Court for the Southern District of Ohio to two counts of an Information charging her with mail fraud pursuant to 18 U.S.C. § 1341 and the use of a false financial statement on a loan application pursuant to 18 U.S.C. § 1014 (Jt. Ex. 00035–00038). Alison Walton admitted devising and implementing a scheme by which she defrauded her employer Nord Resources Corporation and several banks of cash and common stock valued at over one million, three hundred thousand dollars ($1,300,000.00).

From approximately April 18, 1986, until April, 1987, Alison Walton conducted a scheme to defraud her employer, Nord Resources Corporation, of Dayton, Ohio.

On April 18th, 1986, without authority, Alison Walton issued two Nord stock certificates, each in the amount of 10,000 shares, in the name of the Defendant's

grandmother. The shares had a total value of $345,000.00

She then mailed the information about the issuance of stocks to the American Stock Transfer Company in New York. Walton then converted these shares to her own use.

As a result of stock splits on July 14, 1986, and February 9th, 1987, the stocks misappropriated by the Defendant Alison Walton had a total value of $741,875.00.

Additionally, Alison Walton made false statements to three federally insured financial institutions to obtain loans. Walton falsely represented that she owned large numbers of Nord Resources Corporation stock, when, in fact, she did not. She then posted nonexistent Nord stock as collateral.

These loans included loans from First National Bank, Miamisburg, Ohio, in the amount of $403,623.00, approved August 29th, 1986; from Gem Savings Bank, Dayton, Ohio in the amount of $170,-000.00, approved September 21st, 1987; and from Bank One, Dayton, Ohio, in the amounts of $20,000.00, approved May 10th, 1985, and $32,000.00, approved October 31st, 1985.

These loans are in default. These events occurred in the Southern District of Ohio and elsewhere.

THE COURT: Agent, thank you for your time, sir.

AGENT KOENIG: Thank you.

THE COURT: Miss Walton, you've heard the statement of Agent Koenig. Are his facts correct?

THE DEFENDANT: Yes, they are.

(Jt. Ex. 00029–00031)

On September 6, 1988, the District Court conducted a Sentencing Hearing in Alison Walton's criminal proceeding. The debtor was ordered to serve seven (7) years in the Federal Correctional Institution in Kentucky and ordered to make restitution of nine hundred sixty-six thousand, three hundred twelve dollars and forty-eight cents ($966,312.48) to her victims (Jt. Ex. 00039–00050).

The Chapter 7 Trustee, Herbert Ernst, Jr., conducted an examination of the debtor pursuant to Bankruptcy Rule 2004 on September 22, 1988, at the Montgomery County Jail, and questioned the debtor about her financial affairs, specifically the disposition of the proceeds of her fraudulent activities (Jt. Ex. 00248–00316).

The trustee and Nord have filed motions (Adversary No. 3–88–0206, Doc. 22; Adversary No. 3–88–0207, Doc. 30; Adversary No. 3–88–0146, Doc. 36) pursuant to Federal Rule of Civil Procedure 56 (F.R.Civ.P. 56), made applicable in these proceedings by Bankruptcy Rule 7056 (Bankr.R. 7056), seeking orders granting Summary Judgment denying the discharge of Alison G. Walton and denying the dischargeability of the debt owed to Nord.

In Adversary Number 3–88–0206 the trustee's Motion For Summary Judgment seeks the denial of a discharge to Alison Walton pursuant to § 727(a)(5). Similarly, in *Adversary No. 3–88–0207*, Nord's Summary Judgment Motion seeks a denial of a discharge to Alison Walton pursuant to § 727(a)(5) and also § 727(a)(3). Nord's Motion For Summary Judgment in *Adversary No. 3–88–0146* seeks a determination that the debt due Nord from Alison G. Walton is an exception to any discharge granted the debtor. These Summary Judgment Motions address the discharge and dischargeability of debts only as they pertain to Alison G. Walton and not her husband, Scott T. Walton.

The court will initially determine the Summary Judgment Motions as they relate to the § 727(a)(3) and § 727(a)(5) causes of action, since granting the Motions For Summary Judgment and denying the debtor's discharge will moot Nord's Motion For Summary Judgment seeking a determination of the dischargeability of a specific debt. Additionally, since both Motions For Summary Judgment seeking to deny discharge refer to the same joint exhibits, cite substantially the same case authority and advance similar arguments, the court will discuss and determine these Motions For Summary Judgment in a decision applicable to both proceedings. The court notes that, although the debtor has previously been represented by several attorneys and has

been cautioned that it would be in her best interest to continue to be represented by counsel, Alison G. Walton appears *pro se* in these proceedings.

The court in determining these proceedings, in addition to considering the Joint Exhibits (Jt.Ex.) previously referred to, considered in *Adversary No. 3–88–0146:* the Motion For Summary Judgment Of Nord Resources Corporation To Deny Dischargeability Of The Debt Between Debtor, Alison G. Walton and Nord Resources Corporation (Doc. 36), the debtor's Motion To Deny Summary Judgment Of Nord Resources Corporation To Deny Dischargeability Of The Debt Between Debtor Alison G. Walton And Nord Resources Corporation (Doc. 39), the Reply Memorandum Of Nord Resources Corporation In Opposition To The Motion To Deny Summary Judgment (Doc. 42), the Reply Memorandum Of Alison Walton (Doc. 43); and, in *Adversary No. 3–88–0206:* the Motion Of Trustee To Deny Discharge Of Debtor, Alison G. Walton, And Requesting Summary Judgment (Doc. 22), and the debtor's Reply To Motion Of Trustee To Deny Discharge Of Debtor (Doc. 23); and, in *Adversary No. 3–88–0207:* the Motion For Summary Judgment Of Nord Resources Corporation To Deny The Discharge Of Debtor, Alison G. Walton (Doc. 30), the debtor's Motion To Deny Summary Judgment Of Nord Resources Corporation (Doc. 35) and the Reply Memorandum Of Nord Resources Corporation (Doc. 36).

## II.  APPLICABLE LAW

Pursuant to F.R.Civ.P. 56(c) Summary Judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Material facts

are those which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

It is settled law that the burden of establishing the absence of genuine issues of fact rests with the movant, and the movant is also held to a high standard of proof. *Sartor v. Arkansas National Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944); 6 Moore's Federal Practice § 56.15(3) (2d ed. 1988). Additionally, the court is required to view all the evidence in a light most favorable to the non-moving party and to make all inferences reasonably deducible from such evidence. *Potters Medical Center v. City Hospital Association,* 800 F.2d 568, 572 (6th Cir. 1986).

It is also settled law that an important objective served by summary judgment is the elimination of the expense and delay of unnecessary trials. As the Supreme Court stated, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." (footnote omitted)) *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). *See also, A.I. Root v. Computer Dynamics, Inc.,* 806 F.2d 673, 675 (6th Cir.1986); *In re Warner,* 65 B.R. 512, 516–518 (Bankr.S.D.Ohio 1986).

Nord and the trustee both argue that the debtor has forfeited her right to a discharge by failing to satisfactorily explain loss and deficiency of assets pursuant to § 727(a)(5).[1] Nord also asserts that the debtor has failed to keep or preserve any recorded information from which her financial condition or business transactions can be ascertained. 11 U.S.C. § 727(a)(3).[2] In

---

1.  § 727(a)(5)—The court shall grant the debtor a discharge, unless—the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

2.  § 727(a)(3)—the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless

*Matter of Schwartzman*, 63 B.R. 348, 360 (Bankr.S.D.Ohio, 1986), this court addressed the burden of proof requirements for maintaining and defending 727(a)(5) actions.

Unlike § 727(a)(2) and (3), the element of "intent" need not be shown in pleading and proving a cause of action under § 727(a)(5). 4 Collier On Bankruptcy, supra, ¶ 727.08 at 727–63.

A creditor is not required to rely on a debtor's statement that he no longer has certain assets. *Schultz v. Shapiro (In re Shapiro)*, 59 B.R. 844, 848 (Bankr.E.D.N.Y.1986). For that reason, the plaintiff need only establish a *prima facie* case "that some of the debtor's assets are missing and that the debtor has failed upon request of the plaintiff to give a satisfactory explanation, the debtor has the burden of going forward with evidence that will explain satisfactorily the losses." *Energy Marketing Corporation v. Sutton (In re Sutton)*, 39 B.R. 390, 397 (Bankr.M.D.Tenn.1984). *See also Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *Citizens Fidelity Bank and Trust Company v. Schermer (In re Schermer)*, 59 B.R. 924, 925 (Bankr.W.D.Ky.1986); *Jensen v. Herzog (In re Herzog)*, 60 B.R. 196, 198 (Bankr.M.D.Fla.1986); Bankr.R. 4005.

A *prima facie* case has been held to exist where a creditor shows that a debtor has listed assets in his schedules at a lower figure than he has previously presented himself to be worth, *Bartle v. Markson Bros., Inc.*, 314 F.2d 303, 305–06 (2d Cir.1963); *In re Hochberg*, 17 F.Supp. 916, 919 (D.W.D.Pa.1936); 4 *Collier On Bankruptcy, supra* at 727–63–64, or where there was an unusual and unexplained disappearance of assets shortly before the debtor filed bankruptcy. *In re Chalik*, 748 F.2d at 619–20; *First Texas Savings Association, Inc. v. Reed (In re Reed)*, 700 F.2d 986, 992–93 (5th Cir.1983); *In re Schermer*, 59 B.R. at 925; *In re Shapiro*, 59 B.R. at 848.

Also, as the court stated in *In re Potter*, 88 B.R. 843, 849 (Bankr.N.D.Ill.1988):

> Under this section of the Code [§ 727(a)(5)] the plaintiff has the initial burden of identifying the assets in question by appropriate allegations in the complaint and showing that the debtor at one time had the assets but they are no longer available for the debtor's creditors. *In re Savel*, 29 B.R. 854 (Bankr.S.D.Fla.1983). Once the creditor has introduced some evidence of the disappearance of substantial assets, the burden shifts to the Debtor to explain satisfactorily the losses or deficiencies. *In re Martin*, 698 F2d. 883 (7th Cir.1983).

*See also, In re Dolin*, 799 F.2d 251 (6th Cir.1986).

A purpose of § 727(a)(5) of the Code is to "secure the equitable distribution of the estate among creditors and relieve the honest debtor from the oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *National Bank v. McNamara*, 89 B.R. 648, 654 (Bankr.N.D.Ohio, 1988) (citation omitted).

The issue of whether a debtor has satisfactorily explained a loss of assets is a question of fact to be determined by the Bankruptcy Court, *In re Chalik*, 748 F.2d 616, 619 (11th Cir.1986), and § 727(a)(5) grants the Court broad power to deny a discharge where the debtor does not adequately explain a loss or a significant dissapation of established assets. *First Federal Life Insurance v. Martin (In re Martin)* 698 F.2d 883, 886 (7th Cir.1983). Further, the debtor's explanation "must consist of more than just a vague hodge podge of financial transactions" *Id.* at 886. The explanation must convince the court of the debtor's good faith and businesslike conduct. Explanations consisting of mere generalities and founded upon nothing by way of verification or affirmation in books, records or otherwise is not satisfactory. *Miami National Bank of Miami, Oklahoma v. Hacker (In re Hacker)* 90 B.R. 994, 996–97 (Bankr.W.D.Mo.1987) *NCNB National Bank of Florida v. Moore (In re*

such act or failure to act was justified under all of the circumstances of the case.

*Moore),* 89 B.R. 935, 937 (Bankr.M.D. Fla.1988).

As the First Circuit Court of Appeals noted,

> The [bankruptcy] statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." [*In re*] *Mascolo,* 505 F.2d [274] at 278 [ (1st Cir.1974) ]. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. *See In re Tabibian,* 289 F.2d 793, 797 (2d Cir. 1961); *In re Shebel,* 54 B.R. [199] at 202 [ (Bkrtcy.D.Vt.1985) ]. *In re Tully,* 818 F.2d 106, 110 (1st Cir.1987).

These same concerns are applicable to an examination of the debtor's financial affairs within the context of § 727(a)(3) and (a)(5). It is clear that a debtor must be prepared to "provide sufficient written financial information to permit creditors to follow the debtor's business transactions, make intelligent inquiry and ascertain the debtor's present and past financial condition. Failure to provide such information without a showing of circumstances warranting excusal will result in the denial of the debtor's discharge." (citation omitted). *In re Bowie,* 80 B.R. 99 (Bankr.N.D.Ohio 1987).

## III. RESOLUTION OF PENDING MOTIONS

The parties in these proceedings have presented the court with an extensive compilation of documents including: (1) the transcript of the District Court proceedings in which the debtor entered her guilty plea (2) the Information to which the debtor pled guilty (3) the sentencing hearing transcript (4) the Criminal Judgment entered in the case (5) transcripts of several of the § 341 hearings (6) the transcript of the Bankr. Rule 2004 Examination of. the debtor (7) copies of the debtors' tax return for 1986 and (8) miscellaneous other doc-

uments. (Jt. Ex. 00001—00371) An examination of the debtor's filings in these proceedings indicates that she relies on the same documents submitted by the movants in defending against the Summary Judgment Motions and in her memoranda and other filings she also states that there are no genuine factual disputes which preclude disposition of these proceedings by Summary Judgment (Adversary No. 3–88–0206, Doc. 23, Adversary No. 3–88–0207, Doc. 35).

It is significant to note at this juncture that, although summary judgment is not favored for disposing of proceedings involving issues of fraud, the debtor's fraudulent prepetition activities that allowed her to obtain over one million, three hundred thousand dollars, in the period 1985 to 1987 have been admitted by the debtor. Accordingly, the issues presented by the summary judgment motions in these proceedings are what does the debtor provide as her explanation and what does the debtor provide in terms of recorded information to substantiate her explanation concerning the loss or deficiency of her assets in the period prior to filing her bankruptcy petition on March 9, 1988. *Matter of Esposito,* 44 B.R. 817, 821 (Bankr.S.D.N.Y.1984).

Both the trustee and Nord argue that the debtor's discharge should be denied because she has failed to satisfactorily explain her loss or deficiency of assets, 11 U.S.C. § 727(a)(5). Nord further argues that the debtor has failed to keep any recorded information from which her financial condition might be ascertained, 11 U.S.C. § 727(a)(3).

According to the Statement Of Facts read into the record at her plea hearing, which the debtor confirmed as being true, she converted 20,000 shares of Nord stock valued at $345,000 to her own use around April 18, 1986; as a result of stock splits by July of 1986, the stock had a total value of $741,875. She also induced several financial institutions to loan her the sums of four hundred and three thousand six hundred twenty-three dollars ($403,623.00) approved August 29, 1986; one hundred seventy thousand dollars ($170,000.00) approved September 21, 1987 and had already

received twenty thousand dollars ($20,-000.00) and thirty two thousand dollars ($32,000.00) loans in May and October of 1985. The debtor's confessed fraudulent activities during the period 1985 to 1987 resulted in her acquisition of assets valued in excess of one million, three hundred thousand dollars ($1,300,000.00). Additionally, the debtor's 1987 Federal Income Tax, Schedule D, Capital Gains And Losses And Reconciliation Of Forms 1099–B, reports total sales of stocks, bonds, etc. in the amount of $1,039,405.00 (Jt. Ex. 00365). The debtor's assets consisted of automobiles (Jt. Ex. 00228, 00240, 00251), miscellaneous household goods and antiques (Jt. Ex. 00253), several horses (Jt. Ex. 00254), various pieces of art work (Jt. Ex. 00255), various pieces of jewelry and furs (Jt. Ex. 00256–00259), Nord Stock, Coca–Cola Stock, U.D.C. Stock, Cowen Income Growth Stock (Jt. Ex. 00263–00271), ownership, with her husband, of a closely held corporation, Arbor Wine and Spirits (Jt. Ex. 00271–00278), various checking accounts and funds on deposit (Jt. Ex. 00227, 00260) and various parcels of real estate (Jt. Ex. 00222–00226, 00232). A number of the sales, transfer or other disposition of these assets were to family members and remain the subject of other pending adversary proceedings in this case. (*Adversary No. 3–88–0164, Herbert Ernst, Jr., Trustee v. Scott and Alison G. Walton, et al.*—recovery of property and *Adversary No. 3–89–0093, Herbert Ernst, Jr., Trustee v. Scott Walton, et al.*—complaint for turnover of property).

The debtor in her Memoranda first argues, although she was willing to provide an explanation concerning her assets, because of pending criminal charges, in order to preserve her Fifth Amendment rights she was not able to fully explain any loss or deficiency in her assets. She then argues, once she had entered her guilty plea and her Fifth Amendment rights were no longer applicable, she was again willing to provide an explanation concerning her assets; but, because she had turned her records over to her attorney or others, she no longer had access to her financial records and was not able to fully explain any loss or deficiency in her assets.

The trustee held § 341 Hearings on April 18, May 18, June 7 and June 27, 1988, during which the Waltons were questioned extensively about their financial affairs. At certain points during these hearings, all of which were held prior to Alison Walton's guilty plea, she invoked her Fifth Amendment protection concerning the Nord stock and the various loans she had obtained and her disposition of the proceeds from the sale of the stock and those loans (Jt. Ex. 00064, 00067, 00068, 00081, 00084, 00088, 00089, 00105, 00106, 00111, 00115, 00116, 00117, 00120, etc.).

Case authority unequivocally supports the debtor's right to invoke the Fifth Amendment privilege without jeopardizing her right to a discharge. *Chicago Title Insurance Co. v. Mart (In re Mart)*, 90 B.R. 547, 551 (Bankr.S.D.Fla.1988); *In re Potter*, 88 B.R. 843 (Bankr.N.D.Ill.1988). In this case, however, when the criminal proceedings were concluded, and no Fifth Amendment protection was being asserted by the debtor, she still did not provide the trustee with any explanation regarding the loss or deficiency of her assets and the recorded information concerning these assets. The court recognizes the debtor's right to invoke her constitutional protection under the Fifth Amendment; however, the debtor, who initiated this bankruptcy case must recognize that, following her guilty plea, her duties of disclosure and cooperation, which had only been delayed, but not eliminated, by her Fifth Amendment protection, would require her to provide information in connection with these assets. It is disingenuous for the debtor to argue that her voluntary surrender of the information concerning these assets to parties of her choice now prevents her from providing a satisfactory explanation for the loss or deficiency of her assets to parties entitled to it by law.

After the debtor entered her plea of guilty in the criminal proceeding, was sentenced and no longer invoked her Fifth Amendment privilege, the trustee, on September 22, 1988, conducted an examination

of the debtor (Jt. Ex. 00248–00316). The debtor's responses to the question posed during this examination were no more enlightening nor informative on the substantive issues concerning the disposition of the proceeds of the Nord Stock and other loan proceeds than her previous failures to answer. The thrust of the debtor's response to these inquiries into the loss or deficiency of her assets was that the bulk of these funds were, for the most part, transferred, on various occasions, into a business, Arbor Wine and Spirits, which was wholly owned by the debtor and her husband; however, as the following questioning of the debtor by the trustee indicates, the debtor was unable to state exactly the amount of funds that went into the business, or to offer documentation to substantiate her statements:

Q. (Trustee) My question is, what happened to that money concerning those shares of stock?

A. (Debtor) Well, what happened is that it was on margin, and there were disbursements that were taken directly from the Cowen account and delivered to Arbor Wine and Spirits for other working capital. They prepared the checks at Cowen and delivered them to Arbor. And then what happened when the stock began to fall, besides having to pay the margin call on it, and then to be able to transfer 2100 shares of Nord Resources stock out of that account to Nord Resources, the stock had to be sold to pay off the margin, the margin that was due on the account in order to get the 2100 shares free and clear. And after all the stock was sold, there ended up being the 2100 shares, which the $7,526.00 which Nord Resources also took when they took the stock.

Q. Where did the money go, it went off to pay off the margin and went into Arbor Wine?

A. That's correct.

Q. How much went into Arbor Wine?

A. I don't know. I was never asked to calculate that. I don't have those records.

Q. . What is your best estimate?

A. I don't have an estimate.
(Jt. Ex. 00269—00270)

. . . .

Q. You borrowed the money on the stocks and put that money into Arbor Wine?

A. That's correct. Plus some of the money did go into our personal account.

Q. How much?

A. I don't have any idea.
(Jt. Ex. 00271)

The above exchange does not represent the first time the debtor failed to provide an explanation concerning a loss or deficiency of her assets.

JI: (Counsel for Nord) Do you know what happened to lets say for example the $16,000.00 that's shown on this check number 102, what was that money used for after it was deposited into your bank account at First National Bank?

A: (Debtor) That could be substantiated by bank records it had been turned over to our attorney. That would be

JI: That wasn't my question as to whether it could be substantiated, my question was do you know what happened to that money after it went into that account, what it was used for?

A: I don't know what specifically it was used for, no.

JI: Let me just ask you before we go on, we have there in two checks in the middle of the page for example $35,000.00 that would have been deposited into the First National Bank of Miamisburg slightly over a year ago in March and April of 1987 and do I understand that you have no idea what happened to that money after it went into the First National Bank?

A: It's not that I don't have any idea, it was the money was expended (?) and the, to get exact records of that it would be on the checking account statement, you would · be able to trace the

JI: So, um, from your checking account records you should be able to see where all that money went, is that what you're saying?

A: You won't be able to see that, no.

(Jt. Ex. 00112—00113)

Additionally, earlier statements of the debtor claimed that the Nord stock and its proceeds were used to repay loan sharks for funds borrowed in connection with Arbor Wine and Spirits (Jt. Ex. 00321, 00353). The debtor subsequently abandoned this position (Jt. Ex. 00353).

The debtor asserts in her memorandum that she was unable to fully answer the trustee's inquires because, as a result of her incarceration, she did not have access to her financial papers and could not, without them, properly explain her financial activities. If so simple an assertion i.e. "I can't explain the loss or deficiency of my assets because I gave my records to: my attorney, my accountant, my spouse, etc.", standing alone, was accepted by the court as a satisfactory explanation under § 727(a)(5), or sufficient justification under §. 727(a)(3), the congressional intention of requiring debtor honesty and disclosure would be destroyed. Further, even if the debtor did not have access to her records or sufficient time in the six month period from her filing in March to her examination in September, 1988, a position the court is unable to accept, she certainly could have prepared such an explanation or justification as part of her filings in January and February, 1989 in connection with these Motions for summary judgment.

The questions asked by the trustee at the 2004 examination were not new or different from those previously asked at the several § 341 Hearings. Hence, the debtor, or others acting on her behalf, had ample opportunity to assemble the financial information so that she could respond to the trustee's questions. As the debtor herself suggested, "[W]hat I need is a progression of the financial statements, which I'll have Scott get for you, …" (Jt. Ex. pg. 00275). Her husband, Scott Walton, who is not incarcerated and has otherwise appeared in these proceedings, could have been available for assistance. The debtor does not claim she was compelled by legal process to surrender her financial records to any court, agency or other entity, nor, does she claim that her financial records are being withheld from her; rather, to the extent such financial records exists, she voluntarily turned them over to others when she had no legal obligation to do so, and now seeks to be excused from her legal obligations under the § 727(a)(5) and (a)(3) by circuitously arguing that the unavailability of these records represents justification for her failure to provide recorded information and satisfactorily explain her loss or deficiency of assets.

Additionally, there is an erroneous premise, upon which the debtor relies, which continually appears in the debtor's responses to questions concerning the loss or deficiency of her assets. The debtor misapprehends who bears to obligation to explain or justify with recorded information any loss or deficiency of assets. It is not the trustee's or the creditor's obligation, in these proceedings, to assemble, compile, coordinate, review or present such explanation or recorded information—it is the debtor's obligation.

## IV. SUMMARY

The denial of a debtor's discharge is, at least for this court, among the more difficult decisions it is requested to render, and such decisions are reached only after the most serious consideration of the evidence presented. The court exercises even greater caution when the decision is rendered in connection with a motion for summary judgment rather than following a trial. The consequences for the debtor are quite severe and extensive. Further, an underlying premise of the Bankruptcy Code is to extend, not to deny, relief to burdened debtors; however, honesty, full disclosure and accurate information must be the constant companions of a debtor on the journey through the bankruptcy court to ensure that the debtor's exit is accompanied by a discharge.

Alison G. Walton is a capable and intelligent debtor, who possesses a degree of sophistication in financial transactions, and, as evidenced by her fraudulent prepetition activities, is familiar with the assembly, coordination and presentation of recorded information essential to explain or justify

**160**

business transactions. Further the debtor's unverified recitations of amounts, calculations and estimates purporting to explain her loss or deficiency of assets, contained in her replies and memoranda filed in opposition to these motions for summary judgment, constitutes the "vague hodge podge of financial transactions" and unsubstantiated, mere generalities concerning losses and deficiencies of assets held unsatisfactory in numerous reported decisions. *In re Martin, In re Dolin, In re Chalik, Matter of Hacker,* and *In re Moore, supra.*

The ultimate burden of proof in connection with the plaintiff's causes of actions under § 727(a)(3) and (a)(5) remains with the plaintiffs, particularly in these motions for summary judgment; however, the uncontradicted evidence establishes that this debtor's confessed fraudulent prepetition conduct enabled her to obtain significant assets in a period prior to filing this bankruptcy. As a result, the plaintiffs have established, under any quantum of proof, clear and convincing or a preponderance, *prima facie* cases and the burden of going forward with evidence to meet the plaintiffs' cases rests with the debtor.

Although the court recognizes that during the pendency of this bankruptcy case the debtor was involved in other significant legal proceedings and recognizes that determinations to grant or deny discharges are not mere mechanical applications of statutory language to determined facts (*Hacker* at 997), upon consideration of all the evidence and arguments presented in these proceedings, the court is unable to conclude that the debtor has met the plaintiffs' *prima facie* cases or established any genuine issues as to any material facts that prevent granting the moving parties judgment as a matter of law.

Accordingly, the Motion For Summary Judgment Of The Trustee To Deny The Discharge Of Debtor Alison G. Walton (Adv. No. 3–88–0206, Doc. 22) is GRANTED, and the Motion For Summary Judgment Of Nord Resources Corporation To Deny The Discharge Of Debtor Alison G. Walton (Adv. No. 3–88–0207, Doc. 30) is

GRANTED and the Motion For Summary Judgment Of Nord Resources Corporation To Deny Dischargeability Of The Debt Between Alison G. Walton And Nord Resources Corporation (Adv. No. 3–88–0146, Doc. 36) is DEEMED MOOT.

A copy of this decision will be filed in each of these adversary proceedings and the court will issue further orders scheduling pretrial conferences on any remaining issues in these adversary proceedings.

Orders in accordance with this decision are simultaneously entered in these proceedings.

SO ORDERED.