**In re Joseph Hudson SADLER and Evelyn Laverne Sadler, Debtors.**

**Cynthia A. Grant and Pro–Line Engineering Corporation, Plaintiffs,**

v.

**Joseph Hudson Sadler and Evelyn Laverne Sadler, Defendants.**

**Bankruptcy No. 01–378–3F7.**

**Adversary No. 01–217.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Aug. 8, 2002.

James A. Fischette, Jacksonville, FL, for Plaintiffs.

Christopher R. Demetros, Jacksonville, FL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This proceeding came before the Court upon an Objection to Discharge filed by Cynthia A. Grant and Pro–Line Engineering Corporation ("Plaintiffs"). The Court conducted hearings on March 19, 2002 and March 25, 2002. Upon the evidence presented and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

On October 5, 1998 Plaintiffs and Debtors ("Defendants") entered into an asset purchase agreement by which Defendants agreed to purchase the assets of Pro–Line Pavement Marking and Installations ("Pro–Line"), a paving business, for $955,000.00. (Pls.' Ex. 2.) The agreement provided for 55 monthly payments of $8,000.00, followed by 103 monthly payments of $5,000.00. (Id.)

In December 1998 Defendants sought a loan to obtain operating capital. On December 22, 1998 they submitted a business loan application, an instrument used to collect initial data on prospective loan clients, to Marine National Bank ("Marine National"). (Pls.' Ex. 11.) Contained therein was a personal financial statement (the "December 22, 1998 Marine National financial statement") in which Defendants valued their household goods at $45,000.00 and a train collection, jewelry, and guns at $20,000.00. (Id.) On that same date Defendants submitted a personal financial statement containing the same figures to the Small Business Administration (the "December 22, 1998 SBA financial statement"), the guarantor of the Marine National loan. (Pls.' Ex. 12.) On January 25, 1999 Defendants submitted a business loan application to the SBA. (Pls.' Ex. 13.) The business loan application to the SBA contained a personal financial statement (the "January 25, 1999 financial statement") which was a continuation of and incorporated the figures used in the December 22, 1998 Marine National and SBA financial statements. (Tr. at 64.)

On March 5, 1999 Defendants executed a security agreement and delivered a promissory note to Plaintiffs for the $955,000.00 purchase price. (Pls.' Exs. 5, 6.) On March 8, 1999 Plaintiffs delivered a bill of sale to Defendants. (Pls.' Ex. 3.)

In August 1999 Pro–Line sought a revolving line of credit from Marine National. Defendants agreed to guarantee the loan and submitted a personal financial statement to Marine National on August 23, 1999 (the "August 23, 1999 financial statement.") (Pls.' Ex. 24.) The August 23, 1999 financial statement was a representation of Defendants' financial condition as of that date, rather than a continuation of the December 22, 1998 financial statements. (Tr. at 71.) Defendants again valued their household goods at $45,000.00 and a train collection, jewelry, and guns at $20,000.00.

During 2000 Defendants defaulted on the promissory note. (Tr. at 17.) Plaintiffs filed suit in Circuit Court in Duval

County, Florida to collect the outstanding balance.

On June 12, 2000 Defendants paid attorney Michael Price $2,500.00. (Pls.' Ex. 43.) Mr. Price represented Defendants in negotiations with Plaintiffs which culminated in a July 6, 2000 stipulation between the parties by which the amount owed to Plaintiffs was reduced to $344,505.42. (Pls.' Ex. 10.) Joseph Sadler testified that Defendants were not contemplating bankruptcy at that time. (Tr. at 123.) Defendants subsequently defaulted on the stipulated obligation. (Tr. at 90.)

On December 2, 2000 Joseph Sadler wrote a letter to Plaintiff Cynthia Grant offering her a $52,000.00 cash settlement to be paid in February 2001, indicating he expected to receive a disbursement from his deceased father's trust. (Pls.' Ex. 42.)

On December 28, 2000 Defendants issued a financial statement to Capital Solutions (the "December 28, 2000 financial statement") which listed assets totaling $616,390.00 and liabilities totaling $290,200.00, for a net worth of $326,190.00. (Pls.' Ex. 40.) Defendants listed the following assets: 1) cash in bank accounts totaling $14,890.00, comprised of $7,390.00 in a SouthTrust bank account in the name of Pro–Line, $3,000.00 in a SouthTrust bank account in the name of Joseph Sadler, and $4,500.00 in a SouthTrust bank account in the name of Evelyn Sadler, 2) Evelyn Sadler's 401k valued at $250,000.00, 3) life insurance policies with cash surrender values totaling $7,500.00, 4) automobiles valued at $59,000.00, 5) real estate valued at $160,000.00, and 6) personal property valued at $125,000.00.

On January 17, 2001 Defendants filed a Chapter 7 bankruptcy petition. (Doc. 1.) The balance owed to Plaintiffs by Defendants on the date of the filing of the petition was $896,068.58. (Tr. at 82.) On February 1, 2001 Defendants filed their schedules and Statement of Financial Affairs. (Pls.' Ex. 1.)

In addition to Pro-line, Defendants were involved in three other businesses during the two years prior to the filing of the petition: Superior Detailing ("Superior"), Pro–Line Penske Truck Rental, Inc. ("Pro–Line Penske"), and Sadler Marketing Associates ("Sadler Marketing"). Superior, a car detailing business which operated out of the same location as Pro–Line, closed on January 29, 1999. (Tr. at 119, 120.) Pro–Line Penske served as a rental agent for Penske Truck Rentals beginning in February 1999 and was terminated in December 1999 because of a lack of rentals. (Tr. at 120.) Joseph Sadler testified that neither business owned any assets. (Tr. at 119–121.) Sadler Marketing was a business by which Joseph Sadler brokered and marketed building materials and related items. (Joseph Sadler June 28, 2001 Dep. at 13.) Although Joseph Sadler testified that Sadler Marketing was discontinued after Defendants purchased the assets of Pro–Line, Joseph Sadler wrote a letter to the United States Postal Service on June 16, 2000 by which he requested that the mail for Pro–Line and other businesses, including Sadler Marketing, be bundled daily. (Pls.' Ex. 38.)

### Bankruptcy Schedules

On their summary of schedules, Defendants indicated their liabilities of $385,079.11 exceeded their assets of $255,653.57 by $129,425.54.

### Schedule B

On Schedule B Defendants listed the following: 1) cash in bank accounts totaling $292.02, of which $273.51 represented the balance in the SouthTrust accounts, 2) Evelyn Sadler's 401k plan valued at $69,613.22, 3) a life insurance policy with a cash surrender value of $6,308.33, 4) automobiles valued at $35,413.00, 5) real estate

valued at $125,000.00, and 6) other personal property valued at $19,045.51.[1]

### B–2  Interest in checking accounts

Defendants listed a number of checking accounts on B–2 of their schedules. Plaintiffs allege that Defendants failed to include interests in the following accounts: an account at AmSouth Bank in the name of Superior, an account at SouthTrust Bank in the name of Pro–Line Penske, an account at AmSouth Bank in the name of Pro–Line Penske, an account at AmSouth Bank in the name of Sadler Marketing, an account at AmSouth Bank in the name of Pro–Line, and an account at NationsBank in the name of Pro Line Penske. Plaintiffs presented no evidence establishing that Defendants had an interest in any of these accounts on the date of the filing of the petition.

### B–4  Value of household goods

On their Schedule B, Defendants valued their household goods and furnishings at $1,880.00. Joseph Sadler testified that Defendants used replacement cost of $45,000.00 on their financial statements and "distress bankruptcy sale" cost on Schedule B. (Tr. at 115–116.) He further testified that Defendants did not dispose of any personal property between December 1998 and the filing of the petition.

### B–5, B–7, B–8 Collectibles, jewelry, and firearms

Defendants indicated on Schedule B–5 that they did not own any collections or collectibles. In response to items 7 and 8 of Schedule B, Defendants indicated they owned jewelry valued at $90.00 and a pistol valued at $85.00 for a total of $175.00. Defendants offered no explanation for the

almost $20,000.00 difference in valuation on their financial statements and on their schedules.

### B–12–Stock and interests in businesses

In response to item 12 on Schedule B, Defendants indicated they owned no stock or interests in any businesses. Plaintiffs allege Defendants failed to include interests in Pro–Line, Pro Line Penske, Sadler Marketing, Sadler Construction, and Superior. Plaintiffs presented no evidence establishing that Defendants had an interest in Pro Line Penske, Sadler Marketing, Sadler Construction, or Superior on the date of the filing of the petition.

### B–19  –Interests in estate of a decedent

In response to item 19 on Schedule B, Defendants indicated they had no interests in the estate of a decedent, death benefit plan, life insurance policy, or trust. During his January 17, 2002 deposition, Joseph Sadler testified that when he wrote the December 2, 2000 letter to Cynthia Grant offering her a cash settlement, he expected to receive money from his father's estate but that his mother, the sole heir, is still living, and none of the children has received any money. (Joseph Sadler January 17, 2002 Dep. at 19.)

### Schedule F–Amount owed to Plaintiffs

On Schedule F, Defendants listed Plaintiffs as unsecured creditors with a claim of $0.

### Statement of Financial Affairs

### Item 9

In response to item 9 concerning payments related to debt counseling or bankruptcy in the year prior to the filing of the

---

1. The December 28, 2000 financial statement categorized money in bank accounts, retirement plans, the cash surrender value of life insurance policies, automobiles, and personal property separately. For purposes of comparison, the Court refers to Defendants' personal property on Schedule B other than the money in the SouthTrust accounts, Evelyn Sadler's 401k plan, the cash surrender value of life insurance policies, and automobiles as "other" personal property.

petition, Defendants indicated they paid a $100.00 attorney fee to Lansing J. Roy and a $200.00 fee for the filing of the petition. Defendants did not include the June 12, 2000 $2,500.00 payment to Michael Price.

### Item 11

In response to item 11, Defendants indicated they did not close any financial accounts in the year prior to the filing of the bankruptcy petition. Plaintiffs contend Defendants failed to list accounts for Superior, Pro–Line Penske, and Sadler Marketing. Although Plaintiffs presented evidence establishing the Superior account was open as late as November 26, 1999 (Pls.' Ex. 36.), they did not establish that the account was closed in the year prior to the filing of the petition. Plaintiffs presented evidence that the Pro–Line Penske account was open as late as February 17, 2000. (Pls.' Ex. 28.) Assuming Defendants accurately represented on Schedule B–2 the accounts in which they had an interest on the date of the filing of the petition, the Pro–Line Penske account was necessarily closed during the year prior to the filing of the petition. Plaintiffs presented no evidence as to the closing date of the Sadler Marketing account.[2]

### Item 16

In response to item 16, Defendants listed Pro–Line as the only business in which they were officers, directors or managing executives within the two years immediately preceding the commencement of the

case. Defendants did not list Superior, Pro–Line Penske, and Sadler Marketing.

### Item 17–D

On item 17–d of their Statement of Financial Affairs Defendants indicated they did not issue any financial statements to financial institutions, creditors, or other parties during the two years prior to the filing of the petition. Defendants now concede they issued the December 22, 1998 and January 25, 1999 financial statements. They correctly point out that the December 22, 1998 financial statement was not issued during the two years prior to the filing of the petition and that the January 25, 1999 financial statement was a continuation thereof. However, Defendants offered no explanation as to their failure to list the August 23, 1999 financial statement. Finally, they argue that the December 28, 2000 financial statement was not a financial statement because Capital Solutions is a payroll company, not a loan or finance company.

### Production of Documents

On December 21, 2001 Plaintiffs requested that Defendants produce statements and cancelled checks for all bank accounts in Defendants' names or upon which they were signatories during the three years prior to the filing of the bankruptcy petition. (Adv.Doc. 13.) Although they produced the bank statements, Defendants failed to produce cancelled checks for two personal checking accounts at SouthTrust Bank, bearing account numbers 94–251–580 and 27769736.[3]

---

2. Plaintiffs' Exhibit 29, which appears to be a deposit stamp for Sadler Marketing, contains no date. The exhibit proves only that Sadler Marketing had a bank account at some point in time, not when the account was closed.

3. During Joseph Sadler's January 17, 2002 deposition Plaintiffs' counsel questioned Joseph Sadler concerning Defendants' failure to produce cancelled checks for the two South-Trust accounts. (Joseph Sadler January 17,

2002 Dep. at 12–16.) At trial the following exchange took place between Plaintiff's counsel and Joseph Sadler.

Q: Did you ever produce for me to examine the cancelled checks of your bank accounts that we requested in our notice to produce?
A: We produced all the bank statements I thought.
Q: You produced the statements, but you did not produce any checks, did you? In

Defendants failed to submit an exhibit list ten days prior to the trial as required by the Court's pre-trial order. As a result, the Court did not allow Defendants to submit documentary evidence. Defendant Joseph Sadler appeared at the trial and testified. Defendant Evelyn Sadler did not appear at the trial.

## CONCLUSIONS OF LAW

■■■ Plaintiffs object to Defendants' discharge pursuant to 11 U.S.C. §§ 727(a)(3), 727(a)(4)(A), 727(a)(4)(D), and 727(a)(5).[4] The Bankruptcy Code favors discharge of the honest debtor's debts and provisions denying this discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. *See Cohen v. McElroy (In re McElroy)*, 229 B.R. 483, 487 (Bankr.M.D.Fla.1998). However, there are limitations on the right to a bankruptcy discharge. Federal Rule of Bankruptcy Procedure 4005 provides that the initial burden of proof on an objection to discharge lies with the plaintiff. Fed. R.Bankr.P. 4005. A plaintiff bears the initial burden of proving, by a preponderance of the evidence, that a debtor's discharge should be denied. *See Grogan v. Garner*, 498 U.S. 279, 285–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Hawley v. Cement Indus., Inc. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir.1995); *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *Manhattan Leasing Sys., Inc. v. Goblick (In re Goblick)*, 93 B.R. 771, 775 (Bankr.M.D.Fla.1988). However, once a plaintiff meets the initial burden, the debtor has the ultimate burden of persuasion. *See id.* That is, the debtor must bring forth "enough credible evidence to dissuade the court from exercising its discretion to deny the debtor's discharge based on the evidence presented by the objecting party." *Law Offices of Dominic J. Salfi, P.A. v. Prevatt (In re Prevatt)*, 261 B.R. 54, 58 (Bankr.M.D.Fla. 2000).

■■■ Preliminarily, the Court must address the effect of Defendant Evelyn Sadler's failure to appear at the trial. Although Federal Rule of Bankruptcy Procedure 4002(2) requires a debtor to attend the hearing on a complaint objecting to discharge and to testify if called as a witness, a debtor's failure to do so does not mandate the denial of her discharge. *See Kramer v. Poland (In re Poland)*, 222 B.R. 374, 376 (Bankr.M.D.Fla.1998). However, the entry of a default judgment upon a debtor's failure to appear at an objection to discharge hearing is clearly within the Court's discretion. *See id.* Nonetheless, the Court elects to proceed in the following manner. The Court will

your deposition you agreed to produce the checks, and you never did; is that correct?
A: We produced all that we had records of.
Q: Don't your bank statements normally have either the canceled checks or photographs of the canceled checks?
A: Yes, sir.
Q: Why didn't you—
A: But we moved the location way back in March. On that particular day, it was pouring down rain. And we were unable to find some of those checks. We found all of the statements, but we were unable to find some of the canceled checks.

On cross-examination Joseph Sadler testified that Defendants failed to produce checks for the Superior and Pro–Line Penske accounts. However the Court interprets the above exchange to mean that Defendants failed to produce the checks which were discussed at the deposition, the checks for the two SouthTrust accounts.

4. Although the complaint alleged an objection to discharge pursuant to 11 U.S.C. § 727(a)(2), Plaintiffs presented no evidence in support of that Count. Therefore, the Court will overrule Plaintiffs' objection to Defendants' discharge as to § 727(a)(2).

enter a judgment against Defendant Evelyn Sadler if Plaintiffs' evidence is sufficient to establish a prima facie case for denial of her discharge. Evelyn Sadler is not entitled to present evidence in her defense.[5]

### § 727(a)(3)

In their complaint, Plaintiffs allege that Defendants concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information, including books, documents, and records from which Defendants' financial condition and business transactions might be ascertained. In their post-trial submissions, Plaintiffs allege that Defendants lost and/or withheld records, failed to produce records, and gave an excuse of a rainy day for records being lost. The issue before the Court is whether Defendants' failure to produce the cancelled checks for the personal checking accounts at SouthTrust Bank warrants a denial of their discharge pursuant to § 727(a)(3).

11 U.S.C. § 727(a)(3) provides for denial of a debtor's discharge if:

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3).

■ The purpose of Section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of a debtor's affairs and to test the completeness of the disclosure requisite to a discharge. *See PNC Bank v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 95 (Bankr.W.D.Pa.2000) (citing *Meridian Bank v. Alten (In re Alten)*, 958 F.2d 1226 (3rd Cir.1992)). This statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history. *See Meridian Bank*, 958 F.2d at 1230 (citations omitted). A creditor objecting to a discharge under § 727(a)(3) has the initial burden of proving "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Id.* at 1232. Once a creditor shows that a debtor's records are inadequate, the burden shifts to the debtor to justify such inadequacies. *See id.* at 1233.

■ The Court finds that Defendants' failure to produce cancelled checks for two checking accounts at SouthTrust Bank, standing alone, does not constitute a failure to maintain and preserve adequate records. Defendants produced the bank statements. Because Plaintiffs failed to meet their initial burden of proving that Defendants' records were inadequate, the Court will overrule Plaintiffs' objection to Defendants' discharge as to § 727(a)(3).[6]

### § 727(a)(4)(D)

■ Plaintiffs also contend that Defendants should be denied a discharge pursuant to § 727(a)(4)(D). Section 727(a)(4)(D) provides for denial of a debtor's discharge

---

**5.** Because of Defendants' failure to timely submit an exhibit list, such evidence would consist only of Joseph Sadler's testimony.

**6.** Because Plaintiffs failed to satisfy their initial burden pursuant to § 727(a)(3), Defendant Evelyn Sadler's failure to appear at the trial and her consequent inability to set forth a defense have no effect on her entitlement to a discharge as it pertains to § 727(a)(3).

if he "withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs." 11 U.S.C. § 727(a)(4)(D). Although Plaintiffs point out that their objection to Defendants' discharge under § 727(a)(4)(D) is "pretty much based on the same evidence" as their objection under § 727(a)(3), Plaintiffs presented no evidence that the Trustee requested copies of the cancelled checks relating to the two SouthTrust bank accounts or that the Trustee requested any other documents. The Court will therefore overrule Plaintiffs' objection to Defendants' discharge under § 727(a)(4)(D).

### § 727(a)(4)(A)

■ Section 727(a)(4)(A) provides for denial of a debtor's discharge if he "knowingly and fraudulently, in or in connection with the case-made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The purpose of § 727(a)(4)(A) is to ensure that "that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." Boroff v. Tully (In re Tully), 818 F.2d 106, 112 (1st Cir.1987). Section 727(a)(4)(A) requires a court to find that the debtor knowingly made a false oath that was both fraudulent and material. See Swicegood v. Ginn (In re Ginn), 924 F.2d 230 (11th Cir.1991). To be fraudulent, the oath must be made with "a knowing intent to defraud creditors." Parnes v. Parnes (In re

Parnes), 200 B.R. 710, 714 (Bankr.N.D.Ga. 1996) (citing Swicegood, 924 F.2d at 232). Although a single omission is generally insufficient to support an objection to discharge, a series of omissions may create a pattern which demonstrates the debtor's reckless disregard for the truth. See Jones v. Phillips (In re Phillips), 187 B.R. 363, 369 (Bankr.M.D.Fla.1995) citing In re Clawson, 119 B.R. 851 (Bankr.M.D.Fla. 1990). From this pattern of behavior, fraudulent intent may be presumed. See id. citing In re Sausser, 159 B.R. 352 (Bankr.M.D.Fla.1993). For a false oath to be considered material, it must be shown that it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Chalik, 748 F.2d at 618 (citations omitted). A creditor objecting to discharge has the burden of producing sufficient evidence to "give rise to a reasonable inference that the debtor failed to disclose information with the intent to hinder the investigation of the trustee and creditors." Prevatt, 261 B.R. at 59 (citing Chalik, 748 F.2d at 619.) The burden then shifts to the debtor to overcome the inference with credible evidence. Id.

■ Plaintiffs contend that Defendants knowingly and fraudulently made false oaths or accounts on Schedule B–2, B–4, B–5, B–7, B–8, B–12, B–19, Schedule F, and Items 9, 11, 16, and 17–D of their Statement of Financial Affairs. Upon a thorough review of the evidence, the Court finds that the following constitute false, material oaths:

1. Defendants' representation on B–5 that they did not own any collections or collectibles, their representation on B–7 that they owned jewelry valued at $90.00, and their representation on B–8 that they owned a pistol valued at $85.00. Defendants repre-

sented on their December 22, 1998 and August 23, 1999 financial statements that they owned a train collection, jewelry, and guns worth $20,000.00.[7]

2. Defendants' representation on B–12 that they owned no stock or interests in any businesses when in fact they owned an interest in Pro–Line.

3. Defendants' representation on Schedule F that the amount of Plaintiffs' claim was $0 when in fact the balance owed to Plaintiffs by Defendants on the date of the filing of the petition was $896,068.58.

4. Defendants' representation on Item 11 of their Statement of Financial Affairs that they had not closed any financial accounts in the year prior to the filing of the petition. The Pro–Line Penske account was closed during the year prior to the filing of the petition.

5. Defendants' representation on Item 16 of their Statement of Financial Affairs that Pro–Line was the only business in which they were officers, directors, or managing executives within the two years prior to the filing of the petition. Joseph Sadler was an officer, director, or managing executive of Superior, Pro–Line Penske, and Sadler Marketing within the two years prior to the filing of the petition.

6. Defendants' representation on Item 17–D of their Statement of Financial Affairs that they had not issued any financial statements to financial institutions, creditors, or other parties during the two years prior to the filing of the petition. Defendants issued financial statements on August 23, 1999 and December 28, 2000.

Additionally, the Court is left with the firm conviction that Defendants exhibited at a minimum a reckless disregard for the truth, sufficient to give rise to an inference of fraud, in the completion of their schedules. The burden shifts to Defendants to come forward with credible evidence to overcome that inference. Because she failed to appear at the trial, Evelyn Sadler is not entitled to offer evidence to overcome the inference of fraud and Plaintiffs are entitled to a judgment against her as to § 727(a)(4)(A). Joseph Sadler testified that Superior and Pro–Line Penske had no assets and that Defendants' failure to list them on their schedules was inadvertent. Additionally, Joseph Sadler testified that Capital Solutions was a payroll company and that the December 28, 2000 financial statement is therefore not a financial statement. Joseph Sadler offered no explanation as to the remaining false oaths. The Court finds that Joseph Sadler's testimony is not sufficient or sufficiently credible to overcome the inference of fraud established by Plaintiffs. Accordingly, the Court will sustain Plaintiffs' objection to Joseph Sadler's discharge pursuant to § 727(a)(4)(A).

## § 727(a)(5)

Finally, Plaintiffs contend that Defendants should be denied a discharge pursuant to § 727(a)(5) because they failed to explain satisfactorily a loss or deficiency of assets to meet their liabilities. Specifically, Plaintiffs contend that Defendants failed to explain why their assets exceeded their liabilities by $326,190.00 on December 28, 2000 while their liabilities exceeded their assets by $129,425.54 just three

---

7. Although Joseph Sadler testified that Defendants did not dispose of any personal property between December 22, 1998 and the date of the filing of the petition, Defendants' schedules do not reflect the ownership of a train collection.

weeks later. A prima facie case under § 727(a)(5) has been held to exist where a creditor shows that a debtor has listed assets in his schedules at a lower figure than he has previously presented himself to be worth, or where there was an unusual and unexplained disappearance of assets shortly before the debtor filed bankruptcy. *See PNC Bank*, 246 B.R. at 116 (quoting *Ernst v. Walton (In re Walton)*, 103 B.R. 151, 155 (Bankr.S.D.Ohio 1989)). As with § 727(a)(3), the burden shifts to a debtor to explain losses or deficiencies once evidence of disappearance of substantial assets is introduced. *See id.* "To be satisfactory, 'an explanation' must convince the judge. Vague and indefinite explanations of losses that are based on estimates uncorroborated by documentation are unsatisfactory." *Chalik*, 748 F.2d at 619. *See also Hawley v. Cement Indus., Inc. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir.1995) (affirming finding that debtor's testimony and lack of documentation was unconvincing); *PNC Bank*, 246 B.R. at 117 (finding creditor not required to rely on mere statement that assets no longer exist). Plaintiffs have clearly established a prima facie case for denial of Defendants' discharge under § 727(a)(5). Defendants valued their other personal property at $125,000.00 on their December 28, 2000 financial statement and at $19,045.51 just three weeks later. Additionally, the balance in the SouthTrust accounts went from $14,890.00 on December 28, 2000 to $273.51 on January 17, 2001. The burden to explain the discrepancies shifts to Defendants. Because she failed to appear at the trial, Evelyn Sadler is not entitled to offer evidence to explain the discrepancies and Plaintiffs are entitled to a judgment against her as to § 727(a)(5). Although Joseph Sadler appeared at trial and testi-

fied in his defense, his explanation was unsatisfactory. Other than pointing out that Defendants used replacement cost to value their household goods and furnishings on their financial statements and "distress bankruptcy sale" cost to value the same items on their bankruptcy schedules, Joseph Sadler shed little light on an approximate $100,000.00 decrease in the value of Defendants' other personal property in the span of three weeks and offered no explanation as to the precipitous decrease in the balance of the SouthTrust bank accounts.[8] The Court will therefore sustain Plaintiffs' objection to Joseph Sadler's discharge pursuant to § 727(a)(5).

## CONCLUSION

Plaintiffs offered no evidence relating to § 727(a)(2). The Court will therefore overrule that portion of Plaintiffs' objection to Defendants' discharge. Because Plaintiffs failed to prove that Defendants did not maintain and preserve adequate records or that Defendants withheld records from an officer of the estate, the Court will overrule Plaintiffs' objection to Defendants' discharge pursuant to §§ 727(a)(3) and 727(a)(4)(D). Plaintiffs produced sufficient evidence to give rise to the inference that Defendants failed to disclose information on their bankruptcy schedules with the intent to hinder the investigation of the trustee and creditors. Because Defendants did not present evidence sufficient to overcome the inference of fraud, the Court will sustain Plaintiffs' objection to Defendants' discharge pursuant to § 727(a)(4)(A). Finally, because Defendants failed to explain satisfactorily a loss of deficiency of assets to meet their liabilities, the Court will sustain Plaintiffs' objection to Defendants' discharge pursu-

---

8. Even if the Court accepts Joseph Sadler's varying methods of valuing household goods and furnishings, a discrepancy of over $57,000.00 between the December 28, 2000 financial statement and Defendants' Schedule B remains.

ant to § 727(a)(5). The Court will enter a Judgment consistent with these Findings of Fact and Conclusions of Law.