In re James Harvey TIPLER, Debtor.

**Francis M. James, III and James & James Law Firm, Plaintiffs,**

**v.**

**James Harvey Tipler, Defendant.**

**Bankruptcy No. 03–42409.**
**Adversary No. 03–03405.**

United States Bankruptcy Court,
N.D. Florida.

Sept. 13, 2005.

---

Philip A. Bates, Pensacola, FL, for Plaintiffs.

John E. Venn, Jr., Pensacola, FL, for Defendant.

## ORDER DENYING DISCHARGE OF DEBTOR

MARGARET A. MAHONEY, Bankruptcy Judge.

This matter came before the court on the plaintiffs' objection to discharge pursuant to 11 U.S.C. §§ 727(a)(2), (3), and (4), and plaintiffs' objection to the dischargeability of their claim pursuant to 11 U.S.C. §§ 523(a)(2), (4), and (6). The Court has jurisdiction to hear these matters pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. These are core proceedings pursuant to 28 U.S.C. § 157(b)(2) and the Court has the authority to enter a final order. For the reasons indicated below, the Court is sustaining the plaintiffs' objections to discharge under §§ 727(a)(2), (a)(4), and (a)(6), and, therefore, need not address the various objections under § 523.

### FACTS [1]

The facts underlying this adversary proceeding go back more than a decade. Francis M. James, III and his wife, Linda James, are partners in the James & James Law Firm. On December 10, 1993, Charles Bentley signed an attorney's contract authorizing James & James to represent him personally and as the executor of his late wife's estate on a 50% contingency fee basis in a medical malpractice suit regarding his wife's death. On December 13, 1993, Francis James, on behalf of James & James, referred the case to the law firm of Tipler & Tipler on a 60/40 split of attorney's fees, with Tipler & Tipler to get 60% of the attorney's fees and pay all costs and expenses. At that time, Tipler & Tipler was a partnership comprised of James Harvey Tipler, and his father, Frank Tipler. On July 3, 1997, the Tiplers' law partnership was incorporated as the Tipler Law Firm, P.C., an Alabama professional corporation. As Frank Tipler's health declined and he subsequently passed away, James H. Tipler became solely responsible for the P.C.

Between 1997 and 1999, James H. Tipler prepared and tried the Bentley case before a jury in the Circuit Court of Covington County, Alabama and obtained a verdict for Bentley in the amount of $2,000,000.00. The verdict was affirmed on appeal. The total judgment, including interest that accrued during the appeal, totaled $2,438,574.06. The defendants in the Bentley suit paid the judgment.

Although James H. Tipler continually acknowledged the referral agreement with the James & James law firm throughout this time, and despite his continual assurances to Mr. James that he would honor the referral agreement, Tipler refused to pay the plaintiffs their share of the attorney's fees after the Bentley award money came in. On December 20, 1999, the plaintiffs, James & James and Mr. James, sued James H. Tipler and the Tipler Law Firm, P.C. in the Circuit Court of Covington County, Alabama, regarding the unpaid referral fee.

While the litigation regarding the referral agreement was pending against Tipler and the P.C., Tipler incorporated The Law

---

1. Other facts relating to specific issues are contained in the sections discussing the law to be applied. These facts are part of the court's fact findings as well. Conversely, the court has omitted facts pertaining to the plaintiffs' § 523 claims, as these facts are unnecessary in light of the court's determination under § 727.

Practice of James H. Tipler, P.A., a Florida professional association, on June 3, 2002. The P.A. was a separate and distinct entity from the P.C. Since the P.A. was not in existence at the time of the referral fee agreement, it was not a defendant to the plaintiffs' suit. According to the defendant, after the P.A. was established he began conducting his practice primarily through the Florida P.A. and its accounts rather than the Alabama P.C. However, the defendant maintains there was no clear demarcation line where the P.C. stopped operations and the P.A. began. Both entities were active for a period of time after the P.A. was established, but, with time, the P.A. took over and the P.C. stopped doing business. The P.C., however, was never legally dissolved.

On May 16, 2003, a partial summary judgment in favor of the plaintiffs was ordered in the James' suit on the referral fee awarding plaintiffs $487,714.81. That order was entered by the Covington County Circuit Court Clerk on May 30, 2003. The defendants, Tipler and the P.C., appealed the ruling, and the judgment was ultimately affirmed. On June 5, 2003, the plaintiffs' judgment against Tipler and his P.C. was recorded in the Covington County probate records. Because the P.A. was not a party to that lawsuit, the plaintiffs' judgment against Tipler and the P.C. did not attach to the P.A.

On May 30, 2003, the same day their $487,714.81 judgment was entered against Tipler and the P.C., the James caused a writ of garnishment to issue from the Clerk of the Court in Covington County. The writ of garnishment was served upon the Jones & Jones Law Firm, in an attempt by the plaintiffs to intercept money due from Jones & Jones to Tipler. That garnishment resulted in some money being sequestered in favor of the plaintiffs. The plaintiffs attempted to garnish money from others owing money to Tipler and/or the P.C., including attorneys involved in a case designated at trial as "the Bofonchik case." On June 9, 2003, the plaintiffs caused writs of garnishment to be issued, and had the writs served upon several parties involved in the Bofonchik case, on June 9 and 10, 2003. James H. Tipler was personally served with the plaintiffs' writ of garnishment on June 10, 2003. None of these writs of garnishment resulted in the plaintiffs acquiring any money on their judgment.

On June 4 or 5, 2003, Tipler and/or his wife, Lisa Locke Tipler, opened a joint checking account at Destin Bank with a $50.00 deposit. Before this joint account was opened, Mr. and Mrs. Tipler had never had a joint bank account at any point in their 10–year marriage or approximately 10 years of cohabitation prior to marriage. Sometime between June 6 and June 9, 2003, Tipler, as counsel, settled the Bofonchik case for $562,500.00. Although the Bofonchik matter was an Alabama case which had been pending since before the P.A. was established, Tipler deposited the settlement money into the trust account of his Florida P.A., on June 9, 2003. The next day, June 10, 2003, Tipler transferred $218,750.00 from the P.A. trust account to the P.A. operating account. On June 12, 2003, Tipler had a $120,000.00 check issued from his P.A. operating account made payable to himself. On June 13, 2003, Tipler deposited the $120,000 check into the newly opened joint checking account at Destin Bank. Also on June 13, 2003, Tipler had checks issued from the P.A. operating account in the amount of $25,000.00 payable to his bankruptcy attorney, John E. Venn, Jr., and $30,000.00 payable to attorney Robert Segal for "present and future legal services." On June 16, 2003, Tipler caused a P.A. operating account check to be issued in the amount of $50,000.00 payable to Destin Bank to reduce a line of credit

which encumbered his Florida homestead. Tipler caused all of these transfers to be made despite his having been personally served with the plaintiffs' writ of garnishment just days before. However, the initial transfers were made through the P.A. which was not subject to the garnishment.

In addition to his home in Andalusia, Alabama, Tipler owned a house in Mary Esther, Florida. Prior to 2002, the Florida house had been used by Tipler and his family as a "weekend" house. According to testimony, the home was in great need of repairs for termite and water damage. In 2001 or 2002, the defendant hired Niko Giannios to begin repairing and remodeling the house. Sometime in 2002, the defendant and his family moved permanently from their home in Andalusia, Alabama, to the home in Mary Esther, Florida, although the renovation work on the Florida house was ongoing.

Shortly after Tipler caused the $120,000 check to be deposited into his joint account with his wife on June 13, 2003, the Tiplers began using those funds to make improvements to the Florida residence. Between June 21, 2003, and September 2, 2003, the Tiplers wrote $74,687.50 in checks from the joint checking account for repairs, remodeling, decorating and furnishing the Florida house. Except for the $50.00 opening deposit, all money deposited in the joint account was from the $120,000.00 check to James H. Tipler written on the P.A. operating account. All these expenditures were made without any payment by Tipler or the P.C. to the plaintiffs on their $487,714.81 judgment.

In a further attempt to collect on their judgment, the plaintiffs levied execution against Tipler's home in Andalusia, Alabama. An execution sale was set for that house at the Covington County Courthouse on September ,29, 2003. On September 2, 2003, Tipler filed for Chapter 7 bankruptcy

protection. The bankruptcy filing stayed the execution sale of the Andalusia house. To date, the defendants, Tipler and the P.C., have not voluntarily paid the plaintiffs any portion of the state court judgment. The only money the plaintiffs have received on the judgment was the small amount received from the garnishment served on Jones & Jones. Tipler, the debtor, is attempting to discharge the plaintiffs' judgment through his bankruptcy.

### LAW

The plaintiffs have objected to the granting of the debtor's discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(4). Additionally, plaintiffs have filed a complaint seeking to have the debt owed to them by the debtor declared nondischargeable under §§ 523(a)(2), (a)(4), and (a)(6).

One of the fundamental goals of the Bankruptcy Code is to relieve the "honest but unfortunate debtor" of his indebtedness, giving him a financial "fresh start." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244–45, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *In re Haas*, 48 F.3d 1153, 1156 (11th Cir. 1995); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994). The Supreme Court has stated:

> that a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." But in the same breath that we have invoked this "fresh start" policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the "honest but unfortunate debtor."

*Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(internal quotations and citations omitted).

■ Given its importance, actions to deny the discharge are construed strictly against the complaining party and liberally in favor of the debtor. *Rutland v. Petersen (In re Petersen),* 323 B.R. 512, 516 (Bankr.N.D.Fla.2005). A creditor seeking to deny a debtor's discharge bears the burden of proof as to each element by a preponderance of the evidence. Fed. R.Bankr.P. 4005; *Grogan,* 498 U.S. at 287, 111 S.Ct. 654. However, once a creditor meets this initial burden, the burden shifts to the debtor to show by a preponderance of the evidence that he is entitled to a discharge. *Crews v. Stevens (In re Stevens),* 250 B.R. 750, 755 (Bankr.M.D.Fla. 2000). Thus, the debtor has the ultimate burden of persuasion, demonstrating that he is entitled to a discharge despite the evidence presented by the objecting party. *Posillico v. Bratcher (In re Bratcher),* 289 B.R. 205, 217 (Bankr.M.D.Fla.2003); *Law Offices of Dominic J. Salfi, P.A. v. Prevatt (In re Prevatt),* 261 B.R. 54, 58 (Bankr. M.D.Fla.2000).

Section 727(a) provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of the property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

. . .

11 U.S.C. § 727(a).

### 727(a)(2)

■ ■ To deny a debtor's discharge under § 727(a)(2), the plaintiffs must show that the debtor transferred, removed, destroyed, mutilated, or concealed property with the intent to hinder, delay, or defraud his creditors. *Chancellor v. Martin (In re Martin),* 239 B.R. 610 (Bankr.N.D.Fla. 1999); *Sperling v. Hoflund (In re Hoflund),* 163 B.R. 879 (Bankr.N.D.Fla.1993). The plaintiffs bear the burden of demonstrating actual fraudulent intent. *Miller,* 39 F.3d at 306. However, because a debtor is unlikely to admit his fraudulent intent, a finding of actual intent may be based on circumstantial evidence or inferred from the surrounding facts and circumstances. *See Future Time, Inc. v. Yates,* 26 B.R. 1006, 1007 (M.D.Ga.), *aff'd* 712 F.2d 1417 (11th Cir.1983) ("Rarely, if ever, has a debtor taken the witness stand and testified under oath that yes, he transferred the property in question with the intent to hinder, delay or defraud his creditors.").

The plaintiffs assert the debtor's discharge should be denied under § 727(a)(2) because of: (1) the debtor's prepetition transfer of $120,000 from his P.A. operat-

ing account to his joint bank account with his wife; (2) the debtor's prepetition transfers of over $70,000 from the joint account to third parties for repair, remodeling, furniture and furnishings for the debtor's homestead; (3) the debtor's transfer of $40,000 to an insider within one year of filing; and (4) the debtor's transfers to or for benefit of Devin Sanders.

█ Pursuant to § 727(a)(2), the plaintiffs must prove by a preponderance of the evidence that: (1) a transfer occurred; (2) the transfer was of debtor's property; (3) the transfer was made either within one year prepetition, and (4) the transfer was done with the intent to hinder, delay, or defraud a creditor or the trustee. *Shappell's Inc. v. Perry (In re Perry)*, 252 B.R. 541, 547 (Bankr.M.D.Fla.2000).

*A. The $120,000 joint account deposit*

The term "transfer" under § 727(a)(2) and § 101(54) is to be broadly construed. *Cain v. Shingledecker (In re Shingledecker)*, 242 B.R. 80, 82 (Bankr.S.D.Fla.1999). "The definition of transfer is as broad as possible ... [A] deposit in a bank account or similar account is a transfer." *In re Levine*, 134 F.3d 1046, 1049 (11th Cir.1998) (*quoting* S.Rep. No. 95–989, 95th Cong., 2d Sess. 26–27 (1978), reprinted in the 1978 U.S.Code Cong. & Admin.News 5787, 5813.) Thus the deposit by Tipler into the joint account with his wife was a transfer. Because the deposit was made on June 12, 2003, it is undisputed this transfer was well within the one-year prepetition. However, the debtor argues first, that the transfer was not of his property, but rather was a transfer of the P.A.'s property, and secondly, that the transfer was not made with the intent to hinder, delay, or defraud.

The debtor's assertion that the $120,000 transferred was not his property, but was property of the P.A. is incorrect. The deposit into the joint account was made in the form of a $120,000.00 check drawn on the P.A.'s operating account and made personally payable to "James H. Tipler." Accordingly, the money transferred into the joint account by the check payable to the debtor individually was a transfer of the debtor's property. Furthermore, the debtor's own testimony supports the theory that the money transferred was his property, for he testified "the $120,000 was a compensation to me for my work for the P.A." Thus the first three elements of the § 727(a)(2) claim are met, which leaves the debtor's intent at the time of the transfer as the only element still at issue.

█ In order to find fraudulent intent, the Court can consider circumstantial evidence or can infer it from the debtor's actions. *Perry*, 252 B.R. at 547. "Badges of fraud" are strong indicators of fraudulent intent. *Id.; see Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 121 (M.D.Fla.1991). These badges of fraud include: (1) lack of adequate consideration for the property transferred; (2) a family or close relationship between the parties; (3) retention of possession for use and benefit; (4) financial condition of the transferor before and after the transfer; (5) cumulative effect of the transactions and course of conduct after onset of financial difficulties or threat of suit; and (6) general chronology and timing of events. *Perry*, 252 B.R. at 547; *Ingersoll*, 124 B.R. at 121–122.

█ Most, if not all, of these six badges of fraud are present in connection with the $120,000 transfer. The transfer of the money into the joint account gave the debtor's wife a one-half interest in the money, although she had no prior interest in it before the deposit, nor did she give any consideration for the money. Additionally, the joint nature of the account

allowed the debtor and his wife to freely enjoy the benefit and use of the funds while precluding the creditors from reaching the money. Most indicative of the debtor's fraudulent intent was the fact that the general chronology and the timing of the events surrounding the joint account deposit clearly indicate the debtor's fraudulent intent at the time of the transfer.

On May 30, 2003, the plaintiffs had a $487,714.81 judgment entered against Tipler. Five days later, on June 5, 2003, the debtor and/or his wife caused a joint bank account to be opened in their names with a $50 deposit. On June 9, 2003, Tipler deposited the Bofonchik settlement money, which totaled $562,500.00, into the P.A. trust account, even though the case was an Alabama case. On the same day, Tipler caused $218,750.00 of the Bofonchik settlement money to be transferred from the P.A. trust account to the P.A. operating account. During the period of time he received the Bofonchik settlement funds, Tipler testified he was aware the plaintiffs had been attempting to garnish moneys payable to him, and Tipler testified he knew the plaintiffs would likely attempt to garnish the Bofonchik proceeds as well. On June 10, 2003, the plaintiffs caused a writ of garnishment to be served on Tipler. On June 12, 2003, one week after the joint account was opened and just two days after he was served with the writ of garnishment, the debtor issued a check from

his P.A. operating account payable to himself for $120,000.00, and deposited the check into the joint account.

Although the debtor and his wife had been married since 1995 and had been living together since 1984, the joint account opened on June 5th, 2003 was the first joint account they had ever opened. For at least the year prior to his bankruptcy filing, the debtor did not have or maintain any individual bank accounts, he had always used his law firm accounts to pay virtually all of his personal expenses. On the other hand, Mrs. Tipler already had an active individual bank account for her own expenses.

The $120,000 deposited into the joint account is directly traceable to money Tipler received for settling the Bofonchik matter. The debtor acknowledged during his testimony that the $120,000 deposited into the joint account came from the Bofonchik settlement.[2] Once Tipler had the Bofonchik settlement money in the P.A. trust account he transferred a substantial portion to the P.A. operating account. Then, on June 12, 2003, Tipler had a check drafted on the P.A. operating account for $120,000 made payable to him personally, which he deposited into the newly opened joint account.

The debtor settled the Bofonchik case sometime between June 6–9, 2003, and had the settlement proceeds deposited into his

2. Tipler testified as follows:
Q: All right. We've established, I think, that you received the money in the Bofonchik [case] on—either over the weekend or on Monday, June 9th, 2003. Is that correct?
A: That is correct.
. . . . . . . . . .
Q: All right. You see there are two deposits [to the P.A. trust account] on June 9th, one for $125,000 and one for $437,000? Is that correct?
A: It was actually $437,500, but yes.

Q: Is that the Bofonchik money?
A: Yes.
. . . . . . . . . .
Q: So you received that money [the Bofonchik money] in your trust account on June 9th, and you deposited a $120,000 of that money into a joint account with your wife on the afternoon of the 12th or the day of the 13th, 2003?
A: Correct.
Trial Transcript Vol. I, pg. 193 ln. 10—pg. 197 ln. 16.

Florida P.A. trust account on June 9, 2003. The funds were put into the Florida P.A. account and not the Alabama P.C. account, even though the Bofonchik case was an Alabama case which had been pending before the P.A. was ever established. Tipler stated that he deposited the Bofonchik funds into the P.A. instead of the P.C. because, after he established the P.A. in June 2002, he used the P.A. accounts for all his cases whether they originated from Florida or Alabama. However, Tipler testified that there was no clear date where the P.C. ended and the P.A. started, and that the P.C. accounts remained opened for some time after the P.A. began, as some P.C. matters were unresolved and ongoing. In fact, the P.C. bank records clearly show that at least as late as April 10, 2003, the P.C. accounts were still actively operating, and that the P.C. professional account was not actually closed until the date of the bankruptcy filing.

Because the plaintiffs had a valid judgment lien against the debtor and the Alabama P.C. and had served Tipler with a writ of garnishment from an Alabama court, Tipler's actions in depositing the Bofonchik proceeds into the Florida P.A. account instead of the Alabama P.C. account is strongly indicative of his intent to hinder, delay, or defraud his creditors. First, the Bofonchik case was an Alabama case which had been pending since before the P.A. was established. Since Tipler testified he never operated his law practice as a sole proprietor, the Bofonchik case must have been a P.C. case. Second, Tipler testified the P.C. accounts remained open for some time after the P.A. was

established, as ongoing P.C. cases were being resolved. The Bofonchik case was one of those ongoing P.C. cases, which was resolved while the P.C. accounts were still open. Third, the P.C. accounts were not closed until the September 2, 2003, nearly three months after the Bofonchik settlement money came in. With this background, the fact that Tipler deposited the Bofonchik settlement money into the P.A. account (which did not have a judgment lien against it) and then transferred a substantial portion of those funds to the newly opened joint account, which creditors could not garnish[3], is indicative of Tipler's intent to hinder, delay, or defraud his creditors.

During the time the Bofonchik settlement was reached and the proceeds were received by him, Tipler was fully aware the plaintiffs were actively attempting to collect on their judgment against him. Tipler's own testimony reveals that he knew the plaintiffs were likely to attempt to garnish the Bofonchik settlement money as well. Therefore, the debtor's actions in taking that money and transferring it into a newly opened joint account, which the plaintiffs could not garnish because of the joint nature of the account, provides indirect evidence of the debtor's intent to hinder, delay or defraud the plaintiffs.

Based on the facts and circumstances, the court finds the plaintiffs have met their burden by a preponderance of the evidence that the debtor had the requisite intent to hinder, delay or defraud his creditors at the time he made the $120,000 deposit into the joint account. Now the burden shifts to the debtor to show by a preponderance

---

**3.** If the unities required to establish a tenancy by the entireties exists, then a presumption in favor of a tenancy by the entireties arises when a married couple jointly opens a checking account. *Beal Bank, SSB v. Almand and Associates*, 780 So.2d 45 (Fla.2001). When a bank account is held as a tenancy by the entireties, only the creditors of the husband and wife, jointly, may attach to the account; the property is not divisible on behalf of one spouse alone, and therefore it cannot be reached to satisfy the obligation of only one spouse. *Id.*

of the evidence that he is entitled to a discharge despite the evidence presented by the plaintiffs. *Bratcher,* 289 B.R. at 217.

The debtor argues that he had no intent to hinder, delay, or defraud his creditors when he transferred the $120,000 into the joint account. He testified, as did his wife, that it was Mrs. Tipler's idea to open the joint account because she was acting as the general contractor for the repairs and remodeling performed on their home, and she needed to be able to write checks to pay the subcontractors for their work. The Tiplers testified the work to the house needed to be done to make the house more liveable for their family on a full-time basis, as the family had moved permanently from Alabama to Florida. While this may be true, the fact that they opened a joint account for the first time in their nearly twenty-year relationship just days after the plaintiffs' judgment was entered against the debtor, and deposited $120,000 of the debtor's individual money into the account a week later is highly suspect. The Tiplers had been living in the Florida house for some time and making repairs to the house without a joint account with a substantial balance. Tipler did not convince the court that suddenly a new account—conveniently unreachable by creditors—was necessary to complete a process begun months before without the account.

The court believes that when all of the debtor's actions are considered together, the evidence is sufficient to justify the denial of the debtor's discharge. After observing the witnesses and judging their credibility, and reviewing all the evidence and the totality of the circumstances, the court finds that the plaintiffs met their burden of establishing all the elements of their § 727(a)(2) claim for the $120,000 joint account transfer, and thereafter, the debtor failed to meet his ultimate burden

by a preponderance of the evidence of showing that despite the plaintiffs' evidence he is entitled to a discharge. Therefore, the debtor's discharge will be denied on that basis.

### B. Transfers of over $70,000 to third parties for improvements to the debtor's home

From June 13, 2003, the date the debtor deposited the $120,000 into the joint account, through September 2, 2003, the date the debtor filed bankruptcy, the Tiplers paid a total of over $70,000 to various third parties for improvements to their home in Mary Esther, Florida. The debtor concedes that the transfers were made, of debtor's (and his wife's joint) property, within one year prior to his bankruptcy filing, but denies the transfers were made with the intent to hinder, delay or defraud.

To meet their burden of proving the debtor's intent, the plaintiffs argue the facts and circumstances surrounding the transfers are sufficient for the court to infer the debtor's intent. The plaintiffs argue that the Tiplers expenditure of over $70,000 on their homestead in the approximately two and a half months before filing was done to increase the value of their exempt homestead while keeping the money away from creditors. The Tiplers testified that they had been planning to do the work on the house long before the work was actually done, and that the work on the house was not to hinder, delay or defraud, but to correct problems caused by water damage and termites. The debtor testified he hired Niko Giannios to begin the work as early as 2001 or 2002, and Giannios's testimony corroborated that. The Tiplers further testified that the work on their house needed to be done to make the house safe and livable for the family to live in on a full-time basis.

Through cross examination, it was revealed that the majority of the $70,000

plus spent on the house was spent not on safety concerns or on repairing wood rot or water damage, but was spent on new furniture and furnishings for the house. The new furnishings were purchased even though the debtor and his wife testified they moved from a much larger house in Andalusia, Alabama, into a much smaller house in Florida, and had to put some of their furniture into storage. Furthermore, Giannios, the contractor, testified that the Florida home was already furnished when he first began working on the house.

■ "It is clear that the denial of discharge is one of several appropriate remedies for a creditor faced with a debtor who has converted non-exempt property in to exempt property for the specific purpose of placing assets beyond the reach of creditors." *First National Bank of Boston v. Smith (In re Smith)*, 157 B.R. 37 (Bankr.M.D.Fla.1993) (citations omitted). However, it is equally clear that the creditor objecting to discharge has the burden of proving all the elements of his objection by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). While there are suspicious circumstances surrounding the repair, remodeling, and furnishing of the Mary Esther home, including the high amounts spent on furniture and furnishings that may have been unnecessary, the plaintiffs have failed to prove these transfers to third parties were made with the actual intent to hinder, delay or defraud.

Even if the plaintiffs had met their burden, the debtor's justification was equally plausible considering the unrefuted testimony that the debtor had permanently moved his family to Florida due to his impending bar suspension in Alabama, the Mary Esther home needed work to be transformed from a weekend house to a permanent residence, and the work done on the house had been contemplated much

earlier. Also, Ms. Tipler, who wrote most of the checks from the joint account, did not appear to be knowledgeable about Mr. Tipler's financial circumstances. Therefore, the court concludes that the debtor's discharge should not be denied due to the transfers related to the repairs, remodeling, and furnishing of the Mary Esther home.

### C. Transfer of $40,000 to insider

■ The plaintiffs argue that the debtor's transfers totaling $40,000.00 from the joint account back to the P.A. operating account should bar his discharge. Although the first three elements of the § 727(a)(2) claim are met, the plaintiffs failed to meet their burden of proving that the transfers were made to hinder, delay, or defraud. The evidence presented indicates the transfers from the joint account back to the P.A. were made to cover the P.A.'s necessary costs of operations, and the plaintiffs failed to prove otherwise. Thus, the debtor's discharge will not be denied on the basis of the transfers back to the P.A.

### D. Transfers to or for the benefit of Devin Sanders

■ The plaintiffs argue that the debtor's multitude of transfers to and for the benefit of Devin Sanders should preclude his discharge. The uncontradicted evidence established that the debtor and Sanders have been involved in an intimate relationship for more than five years. Throughout the five plus years, Tipler has been making these transfers to and for Ms. Sanders' benefit. Both Tipler and Sanders testified that the type and amount of the transfers have been relatively consistent throughout their relationship. In short, there is nothing in the evidence to prove that the transfers to Sanders were for anything other than her support. While the first three elements of the

§ 727(a)(2) claim are met, the plaintiffs failed to meet their burden of proving that the transfers to and for the benefit of Sanders were made with the intent to hinder, delay, or defraud. Therefore, the debtor's discharge will not be denied on this basis.

### 727(a)(3)

The purpose of § 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information regarding the status of a debtor's affairs and to test the completeness of the disclosure requisite to a discharge. *Grant v. Sadler (In re Sadler)*, 282 B.R. 254, 263 (Bankr. M.D.Fla.2002) (citations omitted). Section 727(a)(3) also ensures that the trustee and the creditors are given dependable information which they can rely on to trace a debtor's financial history. *Id.* A creditor objecting to discharge under § 727(a)(3) has the initial burden of proving "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's transactions." *Id.* (quoting *Meridian Bank v. Alten (In re Alten)*, 958 F.2d 1226, 1232 (3rd Cir.1992)). If the creditor shows the debtor's records are inadequate, then the burden shifts to the debtor to justify such inadequacies. *Id.*

In support of their § 727(a)(3) objection to discharge, the plaintiffs submit that the debtor's financial condition could not be ascertained because he has failed to maintain or preserve, among other things: the corporate records for the P.C.; his personal income tax returns for the years 2001, 2002, 2003, and 2004; tax returns for P.C. or P.A. for the years 2001, 2002, 2003, and 2004; inventory and depreciation schedules for the P.A.; and a list of receivables for the P.A. Additionally, because the debtor was the sole shareholder of both the PC and PA, and he admittedly used the P.C.

and P.A. accounts for essentially all of his personal expenses, the plaintiffs allege the bank statements, cancelled checks, and bank account "compilations" submitted by the debtor do not provide plaintiffs with sufficient information to ascertain the debtor's financial condition.

The debtor, in his post-trial brief, acknowledged that the inventory and depreciation schedules for the P.A., the list of receivables for the P.A., and the tax returns from 2001, 2002, 2003, and 2004 were requested by the plaintiffs and were not produced. But, the debtor argues, he is not required to keep or maintain records these records. The court disagrees, at least as to the tax returns.

Income tax returns are the "quintessential documents 'from which the debtor's financial condition or business transactions might be ascertained.'" *Vines v. Internal Revenue Service (In re Vines)*, 200 B.R. 940, 945 (M.D.Fla.1996) (quoting *Nisselson v. Wolfson (In re Wolfson)*, 152 B.R. 830, 833 (S.D.N.Y.1993)). Tax returns are utilized to verify the schedules filed by the debtor, to find property that may be improperly scheduled or not scheduled at all, to determine tax liability, and to determine whether tax refunds are forthcoming. *See Lubman v. Hall (In re Hall)*, 174 B.R. 210, 215 (Bankr.E.D.Va.1994). The returns are essential to the orderly administration of a debtor's estate because without them, creditors and the trustee are forced to blindly accept the debtor's uncorroborated statements as contained in their schedules. *Vines*, 200 B.R. at 945; *Hall*, 174 B.R. at 215. The debtor's failure or refusal to file income tax returns, in violation of his legal obligation to do so, reinforces the court's belief that he should not be permitted the benefit of discharge without providing a complete and accurate account of his financial affairs.

The debtor had an "affirmative duty to 'maintain and retain' comprehensible records." *Goldberg v. Lawrence (In re Lawrence)*, 227 B.R. 907, 916 (Bankr. S.D.Fla.1998). Section 727(a)(3) is meant to ensure that the bankruptcy trustee and creditors will have sufficient information to permit an effective evaluation of the debtor's estate, which is a condition precedent to the granting of a discharge. *Cadle Co. v. Leffingwell (In re Leffingwell)*, 279 B.R. 328 (Bankr.M.D.Fla.2002); *Neugebauer v. Senese (In re Senese)*, 245 B.R. 565 (Bankr.N.D.Ill.2000). "The court has wide discretion in determining the sufficiency of records." *In re Leffingwell*, 279 B.R. at 355 (quoting *County National Bank of South Florida v. Savel (In re Savel)*, 29 B.R. 854, 856 (Bankr.S.D.Fla.1983)). The court must determine if "the books and records of the debtor are adequate to permit the court and creditors to trace the debtor's financial dealings." *Id.* While perfect record keeping is not required, the creditors examining the debtor's records "must be reasonably able to follow the debtor's business transactions, make intelligent inquiry, verify the oral statements and explanations of the bankrupt, and ascertain the present and past financial condition of the bankrupt [with] substantial completeness and accuracy." *Id.* The records provided by Tipler do not allow creditors to do this in this case. Tipler, by not yet filing his tax returns, leaves creditors with no firmly established income and expense figures for Tipler. This lack made review of his payments to Sanders difficult and review of his business versus personal expenses difficult. Tipler testified to no compelling reason why these returns were not complete for a four year period.

The plaintiffs further contend that Tipler should not be granted a discharge because he failed or refused to keep adequate records of the financial affairs of the P.C. and P.A. Plaintiffs argue that these records would reveal defendant's true financial condition, as well as possibly uncover additional alleged fraudulent transfers. Because the evidence is abundantly clear that the debtor used these law firm accounts not only for business expenses, but also used them continuously for his personal expenses, the court agrees with the plaintiffs' contention, and finds that full disclosure of the P.C. and P.A. records are needed as well to determine the debtor's financial condition. The debtor failed to do this.

The records that were supplied by Tipler consisted of bank statements for the P.C., P.A., and the joint account, canceled checks, deposit slips, a "balance sheet" for the P.A. and what the defendant describes as the "general ledger and compilations" for the P.C. and P.A. Although the debtor correctly notes that virtually all of the evidence that was introduced by the plaintiffs in this adversary proceeding came from his production of documents, this does not mean he has met his record-keeping requirements. No records have been disclosed detailing what, if any, assets remain in the P.C. The defendant testified first that he did not liquidate the assets, but later testified he sold some of them at a "garage sale." The defendant then testified that he did not have any receipts from the sale of those assets.

The debtor testified that the P.C. records were kept and maintained by his former office manager, Janie Hudson, and that she would know the location of the P.C. corporate records. But when Ms. Hudson took the stand, she testified she did not have possession of the P.C. records, nor did she know where those records were. When asked at trial where the P.C. corporate records were, the defendant replied that they were probably in storage. When asked where the payroll tax returns for the P.C. were, the defendant testified

that he did not know. When asked where the P.C. trust account records were, the defendant testified they were either in his bankruptcy attorney's office, in storage, or in his office, but that he did not know where.

The "balance sheet" produced by the defendant purported to list the assets and liabilities of the P.A. However, the balance sheet lists the P.A.'s accounts receivables as "unknown," the P.A.'s loans to shareholders as "unknown," and the P.A.'s loans from shareholders as "unknown."[4] Likewise, the debtor's schedules and statement of financial affairs lists his income from the P.C. for 2001 as "unknown" and his income from the P.A. for 2002 and 2003 as "unknown." The schedules make no listing at all for debtor's income from the P.C. for years 2002 or 2003 despite the fact that the "general ledger and compilation" for the P.C. stated the P.C. had net profits of over $180,000 in 2002.

Furthermore, at the time of his bankruptcy filing the debtor admittedly used approximately $5,000 per month from the P.A. as "pocket money," as listed in his schedule J. When Ms. Laura Hicks, an employee of the P.A. who worked on the P.A.'s bookkeeping and accounting from July 2003 to February 2004, was asked how the $5,000 per month was accounted for in the P.A.'s books, she testified that Tipler would either write a check to himself or withdraw the money and would staple a receipt to the ledger indicating the use. Ms. Hicks testified that the money was basically the defendants "daily spending money he used for lunches or gas or whatever," but she testified she did not know what Tipler really did with the money because it was cash that he got for himself. The debtor has failed to keep or

produce records or receipts indicating what the "pocket money" was actually spent on, and thus are no records indicating what, if any, assets or gifts were purchased or if fraudulent transfers were made with the pocket money.

The appropriateness of the debtor's record keeping practice depends on the sophistication of the debtor and the extent of his activities. *In re Leffingwell,* 279 B.R. at 356; *Meridian Bank v. Alten (In re Alten),* 958 F.2d 1226, 1231 (3d Cir.1992). "Sophisticated business persons are generally held to a high level of accountability in record keeping." *In re Alten,* 958 F.2d at 1231. Furthermore, "[a]ttorneys and other professionals may be held to the standard of care ordinarily exercised by members of their profession." *Id.* at 1232.

Based on all the evidence presented, the court finds that plaintiffs have met their burden under § 727(a)(3) of showing by a preponderance of the evidence that the defendant has failed to maintain and preserve adequate records, and that such failure makes it impossible to ascertain the debtor's financial condition. Additionally, as the sole officer and shareholder of the P.C. and P.A., he failed to keep or preserve records from which his business transactions might be ascertained. *See Phillips v. Nipper (In re Nipper),* 186 B.R. 284 (Bankr.M.D.Fla.1995). The records produced by the defendant leaves the plaintiffs in a position where they must speculate as to the financial history and financial condition of the debtor and compels the plaintiffs to reconstruct the debtor's financial affairs. This should not be required of creditors. *See Matter of Juzwiak,* 89 F.3d 424 (7th Cir.1996). Accordingly, the burden shifts to the debtor

---

4. As previously noted, the defendant, James Harvey Tipler, is the sole shareholder of the P.A.

to show his failure to maintain adequate records was justified under the circumstances. *Turner v. Tran (In re Tran)*, 297 B.R. 817 (Bankr.N.D.Fla.2003).

The Bankruptcy Code does not specify what constitutes justification for maintaining inadequate records; instead it requires the trier of fact to make that determination based on all the circumstances of the case. *In re Alten*, 958 F.2d at 1231.

> The issue of justification depends largely on what a normal, reasonable person would do under similar circumstances. The inquiry should include the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor in his business; and any other circumstances that should be considered in the interest of justice.

*Id.* at 1231 (quoting *Milam v. Wilson (In re Wilson)*, 33 B.R. 689, 692 (Bankr. M.D.Ga.1983)) Depending on the debtor's sophistication and the extent of his activities, different record keeping practices are necessary. *In re Alten*, 958 F.2d at 1231; *see Goff v. Russell Co.*, 495 F.2d 199, 201–202 (5th Cir.1974). As an attorney with more than 25 years of experience Tipler is not an unsophisticated wage earner, but is a knowledgeable business and professional person who generated substantial revenue from his business. He knew or should have known the value of maintaining adequate records. *In re Alten*, 958 F.2d at 1231. As the court stated in *Manasse v. Wolf (In re Manasse)*, 125 F.2d 647, 649 (7th Cir.1942): "Here we have the case of a lawyer who was well aware of the requirement that he keep books which would truly reflect his financial condition, and fully competent to do so." *See also In re Hofmann*, 81 B.R. 699, 702 (Bankr. S.D.Fla.1987) (attorney with admitted annual income of $50,000 had sophistication

such that failure to keep records constituted deliberate evasive tactic); *In re Russo*, 3 B.R. 28, 35 (Bankr.E.D.N.Y.1980) (attorney with forty years experience not justified in failing to keep or preserve records of financial condition).

In this case, the debtor is a well-educated and sophisticated attorney with more than 25 years of experience. He and his law firms have represented numerous clients and engaged in frequent transactions involving substantial sums of money. Based on these facts and circumstances the court finds the debtor is unjustified in failing to keep adequate records. While the court recognizes that in some situations (such as where there is no business activity involved or the number of transactions is extremely limited) the type of records produced by Tipler may be sufficient, but in this case the records are inadequate. Therefore, the debtor's discharge will be denied under § 727(a)(3).

### 727(a)(4)

 A debtor will be denied a discharge pursuant to § 727(a)(4) if he knowingly and fraudulently made a false oath or account. 11 U.S.C. § 727(a)(4); *Hoflund*, 163 B.R. at 882. The plaintiff must establish the following elements by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) that statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Syngenta Seeds, Inc., v. Eigsti (In re Eigsti)*, 323 B.R. 778, 783–84 (Bankr.M.D.Fla.2005); *In re Perry*, 252 B.R. 541, 549 (Bankr.M.D.Fla.2000); see also *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir.1991); *Chalik v. Moorefield*, 748 F.2d 616 (11th Cir.1984). Deliberate omissions from schedules or the statement of financial affairs may also constitute false

oaths or accounts. *Swicegood*, 924 F.2d at 232; *Chalik*, 748 F.2d at 618.

For a false oath to be considered material, it must be demonstrated that it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik*, 748 F.2d at 618 (citations omitted). Additionally, the false oath or account must be made with the requisite intent, specifically a knowing intent to defraud creditors. *Swicegood*, 924 F.2d at 232. However, actual intent may be inferred from circumstantial evidence. *Martin*, 239 B.R. at 614.

In their joint stipulation of issues for hearing, the parties agreed that the court would decide whether the debtor's discharge should be barred under § 727(a)(4) for his failure to schedule the expenses paid for the benefit of and gifts given to Devin Sanders. The joint stipulation also noted that the plaintiffs would contend the debtor's discharge should be barred under § 727(a)(4) for his failure to schedule the $120,000 transfer to the joint bank account. At the commencement of this trial, plaintiffs' counsel informed the court that he and defendant's counsel had agreed that instead of the defense objecting to evidence presented during the plaintiffs' case in chief on the basis that the evidence exceeded the parameters of the previously stipulated areas of dispute, the plaintiffs would not contend that their had been a trial of issues not framed by consent. Despite that agreement, the plaintiffs post-trial briefs alleges various other basis for denying debtor's discharge under § 727(a)(4). The defense argues that the additional allegations should not be considered. To the contrary, the plaintiffs argue that the court is not precluded from considering these additional false oaths in determining whether the debtor should receive a discharge because: (1) the debtor's schedules and statement of financial affairs are supposed to be true and correct from the beginning; (2) it is clear under the plaintiffs' pre-trial pleadings that they believed additional inaccuracies were likely to be discovered; and (3) it would be impossible to identify all of the possible false oath issues prior to trial because the defendant had yet to testify before the court. Because the plaintiffs have sufficiently proven the debtor's discharge should be barred based on the stipulated issues, the court will not address the appropriateness of those alleged false oaths not listed in the parties joint stipulation of issues.

First, the plaintiffs allege that the debtor's discharge should be denied under § 727(a)(4) for his failure to include transfers for the benefit of and gifts to Devin Sanders in his schedules and statement of financial affairs. It is uncontradicted that the debtor and Sanders have been involved in an intimate relationship for more than five years. During this time the debtor has completely supported Sanders financially, paying among other things, her rent (which for at least the year prior to debtor's bankruptcy was $1,200 per month for a three bedroom two and a half bath house in Destin, Florida), her car note, car insurance, gas, utilities, groceries, and giving her spending money, clothing, and jewelry. Additionally, the debtor testified that in the year preceding his bankruptcy, he gave Sanders "a few thousand" dollars in gifts. The plaintiffs note that despite these acknowledged transfers and gifts, there is nothing in the debtor's schedules or statement of financial affairs indicating the existence of Sanders or the gifts and transfers to her and for her benefit.

Question seven of the statement of financial affairs, asks the debtor to "[l]ist all gifts or charitable contributions made within one year immediately preceding the

commencement of the case." The debtor answered question seven in both his original and amended statement of financial affairs by listing "family members, gifts to wife and daughter for birthdays, Christmas, anniversaries, etc.—Amount unknown." Neither Sanders' name nor anything indicating gifts to her was given in the debtor's response.

The debtor agrees that the gifts to Sanders are not listed in response to question seven, but testified he informed his attorney, John Venn, and Venn's legal assistant, Joan Grabau, that he had given gifts to Sanders, and that the gifts were supposed to be included in the answer. Grabau testified that during a meeting at Venn's office, in which, she, Venn, and the debtor were in attendance, Grabau was initially instructed by Venn to add the word "girlfriend" to the answer to question seven. Venn, later instructed Grabau to use only the word "friend" instead of "girlfriend." In support of this, the defense produced a draft of the debtor's schedules that Grabau had made handwritten notes on during the meeting. On Grabau's draft, the word "girlfriend" was written, and then "girl" was scratched out, leaving just the word "friend." Grabau testified that she made the note on the draft to remind herself to amend the answer to question seven to include gifts to "friend." Grabau further testified that the only reason gifts to "friend" were not listed in the answer to question seven in the statement of financial affairs filed with the court was because of her inadvertent oversight when she completed the filed document.

■ The defense argues that the omission of the gifts to Sanders was an unintentional error by Tipler's attorney's office and should not be a basis to deny his discharge. In a case with very similar circumstances, this court in *Chancellor v. Martin (In re Martin)*, 239 B.R. 610 (Bankr.N.D.Fla.1999), found the debtors' listing in there schedules of their car's value at $200 was an inadvertent mistake in the schedules, after the debtors' attorney's notes from her meeting with the debtors was introduced into evidence and included a handwritten note that the vehicle was worth $2,000 not $200. *See Cohen v. Pond (In re Pond)*, 221 B.R. 29, 34 (Bankr.M.D.Fla.1998) ("[A] mistaken or inadvertent omission will not support denial of discharge."). Although generally "clients are held responsible for the actions of their attorney," *Martin*, 239 B.R. at 615 (citing *Pioneer Investment v. Brunswick*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)), based on the decision in *Martin*, Grabau's handwritten note from the meeting, and Grabau's testimony, which the court believes to be very credible, the court finds the omission of the word "friend" was inadvertent, and therefore will not deny the debtor's discharge based solely on that omission.

But, the plaintiffs argue, even if the word "friend" was included as intended, the debtor's discharge should still be denied under § 727(a)(4) because (1) the debtor gave false an misleading testimony surrounding the gifts and transfers to Sanders, and (2) the addition of "friend" would have only made the schedules and statement of affairs misleading. Plaintiffs contend that "friend" does not connote the relationship or the type and amount of transfers and gifts provided to and for the benefit of Sanders. They support this assertion, with among other evidence, Ms. Grabau's testimony.

Grabau is undisputedly an experienced legal assistant who has assisted Mr. Venn for many years in his capacity as a bankruptcy trustee, and assisted him with all his debtor work for the last 10 years, including assisting in the preparation of schedules and statements of financial af-

fairs. Grabau testified at trial that when she prepares schedules and statement of affairs that involve gifts to people other than the immediate family, she ordinarily tries to itemize what those gifts would be if there were any gifts of significant value. However, there was no itemization of gifts in Tipler's statement of affairs, just a generic listing of "gifts for birthdays, Christmas, anniversaries, etc—Amount unknown."

Furthermore, Grabau testified that if there had been a gift to a friend of jewelry from Tiffany's during the year before the debtor's filing, she would normally expect to list it. Again, although it is now clear the debtor gave Sanders Tiffany's jewelry,[5] the answer to question seven did not itemize any such gift. Grabau also testified that she did not know why the decision was made to say "friend" instead of "girlfriend," but she acknowledged that gifts to "girlfriend" would have better disclosed the kind of gifts involved in this case rather than just saying gifts to "friend."

As in the case of the debtor's statement of financial affairs regarding gifts, Sanders name is nowhere to be found in the schedules or statement of affairs as they pertain to payments or transfers. But unlike the gifts question, there is no argument or evidence by the defense that Sanders was inadvertently omitted. The evidence presented by the defense suggests that the debtor included his transfers for the benefit of Sanders in his Schedule J listing of current expenditures, only the debtor did not itemize or otherwise indicate what part of his expenditures were for Sanders. The

debtor combined his total expenses under each category, and provided the total for each, which according to the debtor, included the expenditures for Sanders. For instance, in the space provided for "Rent or home mortgage payment" the debtor listed a monthly amount of $4,230.00. That figure, according to the debtor, included the mortgage payments for the debtor's Mary Esther house, the mortgage payment for the debtor's Andalusia house, and $1,200 per month rent paid for Sanders' Destin house. Likewise, the other listed expenses included the payments for Sanders' benefit. Thus according to the defense, the transfers for the benefit of Sanders are all listed in debtor's schedule J.

The plaintiffs argue this type of nondisclosure is equivalent to an omission. By grouping all the expenditures together, without disclosing that a significant portion of those expenses were for the benefit of third party living outside the debtor's home, the plaintiffs allege the debtor was intentionally deceiving his creditors regarding his expenses.[6] The court agrees. The first sentence at the top of the Schedule J filed by the debtor instructs how to complete the form stating, "[c]omplete this schedule by estimating the average monthly expenses of the debtor and the debtor's family." Nowhere on schedule J does it mention including transfers made for the benefit of anyone outside the debtor's family. Additionally, the intent to mislead and/or conceal the transfers for the benefit of Sanders is even more evident considering the debtor's specific listing of expenses

---

**5.** Sanders testified to receiving Tiffany's jewelry from the debtor, the bank records show purchases were made from Tiffany's, the debtor admitted to giving Sanders jewelry, and the debtor's wife testified that neither she nor their daughter had received any jewelry from the debtor during the year prepetition.

**6.** Debtor's counsel may not have been aware of the extent of Tipler's payments for the benefit of Sanders before the case was filed. The lack of clear records of income and expenses put all but Tipler at a distinct disadvantage.

for his wife ("wife's credit cards") and his daughter ("child care"), while not specifying any payments for Sanders. The debtor admittedly paid approximately $14,400 in the year preceding his bankruptcy for Sanders' rent alone. Considering that he paid virtually all her other expenses on a monthly basis as well, it is obvious the debtor expended significant money on Sanders behalf, without providing any indication to the creditors or trustee of Sanders existence on his schedules and statement of financial affairs.

Additionally, although the debtor testified at trial that he paid virtually all Sanders' expenses on a monthly basis and had been her "main support" for the last five and a half years, he did not list Sanders as a dependent in his Schedule I. Likewise, the debtor did not mention Sanders during his Rule 2004 examination when asked if he had any dependents other than his wife and child, or when asked if he provided more than 50% of the support for anyone other than his wife and child. The debtor testified as follows:

Q: Any other dependents [other than your wife and daughter]?

A: I'm not sure what the meaning of dependent is. I don't think so, from my understanding, but I don't know what that word means.

Q: I mean, as of today, we'll just say in recent years, have you provided more than 50 percent of the support for anybody other than yourself, your wife and your daughter?

A: Well, I mean, my father was elderly at the end of his life. You might could say that. He's been passed away for over three years.

The debtor testified at trial that he was not allowed to finish his response to those questions when asked, because he was cut off by follow-up questions regarding his father. Although the debtor later in the same 2004 examination testified about Sanders when asked about the realty deposit for her rental house, the court finds the debtor's explanation for failing to acknowledge his support for Sanders when directly questioned incredible and evasive.

At her deposition, Sanders testified that in the last couple of years the debtor had given her jewelry. She testified that during that time the debtor gave her a silver necklace and earrings set and two separate pearl necklace and earrings sets. Sanders further testified that at least two of these three sets came from the jewelry store, Tiffany's. In contrast, at his 2004 examination the debtor was question about his possible jewelry purchases. He testified as follows:

Q: [In] the last two years, have you bought any significant items of art or jewelry?

A: No.

In contrast, the bank records of P.A.'s operating account, which the debtor also used or his personal expenses, show check card purchases were made from that account to Tiffany's & Co. on July 21, 2003, in the amount of $625.40; on August 6, 2003, in the amount of $212.00; and on August 18, 2003, in the amount of $401.25. All three of these purchases were less than two months before the debtor's bankruptcy filing, with the last being just 15 days prior to the petition date. At trial, the debtor acknowledged purchasing the jewelry, but testified that he answered the question at the 2004 exam in the negative because the question used the term "significant" and that he did not believe those jewelry purchases were "significant." Again, the court finds this excuse incredible and evasive.

Additionally, at trial the debtor was asked about the listing of gifts to Sanders. The debtor testified as follows:

Q: Did you list any of the gifts or transfers to Devin [Sanders] in your Schedules or Statement of Affairs filed in this bankruptcy case?

A: Yes, I know there is a list—

Q: So the answer is yes?

A: Would you show me where—I can't find it as easy as you can—can you show me the schedules again? I know that I listed the rent on Caloosa Bay.

Q: Would you tell us—tell the Court where that appears?

A: I am not as familiar with it as you are. It will take me a second.

Following this testimony the court took a short recess, giving the debtor an opportunity to look at the exhibits. The debtor never produced any such listing of the gifts or transfers to Sanders in the schedules or statement of financial affairs because there was no such listing.

The veracity of a debtor's bankruptcy petition, including the schedules and statement of financial affairs, is essential to the successful administration of the debtor's case. *Crews v. Stevens (In re Stevens),* 250 B.R. 750, 754 (Bankr.M.D.Fla.2000). "Therefore, submissions 'must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.'" *Id.* (quoting *Mertz v. Rott,* 955 F.2d 596, 598 (8th Cir. 1992)). A debtor coming before the bankruptcy court must come clean and make full disclosure of all information relevant to the administration of his case. *Heidkamp v. Grew (In re Grew),* 310 B.R. 445, 450–51 (Bankr.M.D.Fla.2004). It is not for the debtor to decide what is and is not relevant. *Id.* at 451. A debtor who omits important information and fails to make full disclosure, places his right to discharge in serious jeopardy. *Id.* While an isolated omission may be attributed to oversight, a pattern of omissions clearly warrants the conclusion that the omissions

from the Statement of Financial Affairs and the Schedules were made with the requisite fraudulent intent. *Id.; see Grew,* 310 B.R. at 451 (incomplete, improper, or incorrect information in the debtor's schedules or statement of financial affairs may sometimes be forgiven if the debtor does not represented by an attorney or is unsophisticated). When there is a pattern of omissions, it is logical to conclude the debtor did in fact make a false oath in connection with the case. *See Hoflund,* 163 B.R. at 883.

After a thorough review of all the evidence of this case, and after observing the witnesses and judging their credibility, the court finds that the debtor's discharge should be denied under § 727(a)(4). The debtor finds the debtor's conflicting statements during his 2004 exam and his trial testimony constitute false oaths, as both examinations were made under oath. Furthermore, the court believes the debtor's schedules and statement of affairs, even with the addition of the word "friend" do not provide full disclosure of his business affairs or his financial condition. The plaintiffs have met their burden by a preponderance of the evidence that Tipler has knowingly and fraudulently made a false oath or account in connection with his bankruptcy case.

The purpose of § 727(a)(4) is to ensure that "those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *Grant v. Sadler (In re Sadler),* 282 B.R.

254, 264 (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir.1987)). The court is of the opinion that the debtor has done just what § 727(a)(4) is designed to prohibit. He has not provided complete disclosure nor has he provided reliable information. His bankruptcy schedules and statement of affairs (both the original and the amended versions) contain evasive answers at best. At trial, the debtor testified in the same evasive manner, providing very few definitive answers to even the most straightforward questions. All in all, the court finds that the debtor has deliberately attempted to provide as little information as he could while still appearing to comply with the requirements of the Code. This is not sufficient. *See Hoflund,* 163 B.R. at 882–883.

■ Section 727(a)(4) requires the court to find that the debtor knowingly made a false oath that was both fraudulent and material. *Swicegood v. Ginn (In re Ginn),* 924 F.2d 230 (11th Cir.1991). A series of omissions may create a pattern which demonstrates the debtor's reckless disregard for the truth. *Sadler,* 282 B.R. at 264; *Jones v. Phillips (In re Phillips),* 187 B.R. 363, 369 (Bankr.M.D.Fla.1995). From this pattern of behavior, fraudulent intent may be presumed. *Id.; In re Sausser,* 159 B.R. 352 (Bankr.M.D.Fla.1993). For a false oath to be considered material, it must be shown that it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Sadler,* 282 B.R. at 264 (quoting *Chalik,* 748 F.2d at 618).

As previously stated, the plaintiff must establish the following elements by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) that statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. The court finds the plaintiffs have met their burden. The plaintiffs have shown the debtor made numerous false and conflicting statements under oath. These conflicting statements made under oath demonstrate the debtor's knowledge that at least one version was false. *Eastern Diversified Distributors, Inc. v. Matus (In re Matus),* 303 B.R. 660, 677 (Bankr.N.D.Ga.2004) (citing *Buckeye Ret. Co. v. Heil (In re Heil),* 289 B.R. 897, 903 (Bankr.E.D.Tenn.2003)) (knowledge that a statement is false can be proven by demonstrating that the debtor knew the truth, but failed to provide the information or provided contradictory information). The plaintiffs also proved the debtor's fraudulent intent by demonstrating the debtor's reckless disregard for the truth by the multiple omissions and half-truths in his schedules and statement of financial affairs. *Sadler,* 282 B.R. at 264; *Jones v. Phillips (In re Phillips),* 187 B.R. 363, 369 (Bankr.M.D.Fla.1995) (a series of omissions may create a pattern which demonstrates the debtor's reckless disregard for the truth, and from this pattern of behavior, fraudulent intent may be presumed); see also *In re Sausser,* 159 B.R. 352 (Bankr.M.D.Fla.1993). The last element is materiality. For a false oath to be considered material, it must be demonstrated that it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik,* 748 F.2d at 618 (citations omitted). Under *Chalik,* the debtor's false oaths concerning the gifts and transfers to and for the benefit of Sanders were clearly material on a number of levels.

Once the plaintiffs met their burden of producing sufficient evidence to "give rise

to a reasonable inference that the debtor failed to disclose information with the intent to hinder the investigation of the trustee and creditors," the burden shifted to the defendant to overcome the inference with credible evidence. *Prevatt,* 261 B.R. at 59 (citing *Chalik,* 748 F.2d at 619). The defendant has failed to provide such credible evidence as stated above. Accordingly, the debtor's discharge will be denied under § 727(a)(4).

Because the court has found the debtor's discharge should be denied under § 727(a)(2), (3) and (4), the court will not address the plaintiffs' § 523(a)(2), (4) or (6) objections to dischargeability. Such a discussion would be superfluous.

THEREFORE, IT IS ORDERED that the objection of plaintiffs Francis M. James and the James & James Law Firm to the discharge of James Harvey Tipler pursuant to 11 U.S.C. § 727(a)(2), (3) and (4) is SUSTAINED and the discharge of debts of James Harvey Tipler is DENIED in its entirety.